2004 VT 35

### State of Vermont v. Roy M. Rheaume

[853 A.2d 1259]

No. 02-400

Present: Amestoy, C.J., Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed April 9, 2004

*Derk A. Wadas*, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Roy Rheaume was convicted by a jury of driving under the influence of alcohol (DUI), 23 V.S.A. § 1201; this DUI conviction was defendant's third and accordingly classified as a felony. See 23 V.S.A. § 1210(d) (person convicted of three or more DUIs shall be fined not more than $2,500 or imprisoned not more than five years, or both); 13 V.S.A. § 1 ("any offense whose maximum term of imprisonment is more than two years ... is a felony"). Prior to his jury trial where he was convicted, defendant moved to suppress statements concerning his identity. These statements were made in response to questions asked by a Vermont State Trooper during processing. In an effort to suppress the statements, defendant argued that his *Miranda* rights were violated because he was read the *Miranda* warnings and subsequently invoked his right to silence prior to questioning by the processing trooper. The trial court denied defendant's motion, finding that "there was no violation of the defendant's Fifth Amendment rights, rights under the Vermont Constitution or the Vermont Public Defender Act by the process followed by the trooper." At the enhancement proceeding, the prosecution used defendant's date of birth and social security number to identify him and show that he had two prior DUI convictions. Defendant now appeals his felony conviction and the trial court's denial of his motion to suppress the statements. We affirm.

¶ 2. On August 31, 2001, a Vermont State Trooper pulled over a speeding vehicle. After the vehicle stopped, the driver, later identified as Roy Rheaume, fled the vehicle and ran into a cornfield. The trooper gave chase, but was unable to see anything in the cornfield. Other troopers arrived on the scene and began searching for defendant. After approximately thirty minutes, defendant was found sleeping in

the cornfield. The troopers who apprehended defendant detected a strong odor of alcohol on defendant's breath and saw that he had difficulty walking. Defendant was arrested for DUI.

¶ 3. Following the arrest, the troopers took defendant to the station for processing, which was videotaped by the processing trooper. Before defendant was given *Miranda* warnings, the processing trooper asked defendant several questions.[1] After defendant answered these questions, the trooper read defendant the *Miranda* warnings. In response to the warnings, defendant stated that he did not wish to speak with the trooper and that he wanted an attorney. Following this request, the processing trooper telephoned the on-call public defender. While the trooper had the attorney on the telephone, the trooper asked defendant his name and date of birth. The trooper also informed the attorney, in defendant's presence, that if defendant submitted to a breath test he could be released, but if he refused he would be lodged. Defendant then spoke with the attorney and agreed to take the breath test. After defendant spoke with the attorney, the trooper, continuing to process defendant, asked him for his address and social security number. Defendant answered the processing questions, apparently truthfully.

¶ 4. Using defendant's date of birth and social security number, the trooper obtained copies of defendant's two prior DUI convictions: one in 1981 and one in 1997. Following a breath test, the trooper charged defendant with a third DUI offense — a felony.

¶ 5. After charges were filed, defendant moved through counsel to suppress the statements and the results of the breath test and to dismiss. The trial court considered the motion during defendant's civil suspension hearing. Subsequent to the hearing, the parties agreed that the court should consider the evidence presented in support of suppression in the civil suspension hearing in deciding defendant's motion to suppress evidence in the criminal case. The court granted defendant's motion to suppress the breath test because of the trooper's statement to the on-call attorney that if defendant refused the breath test he would be lodged, but denied his motion to suppress the statements concerning his identity. The court entered judgment in the

---

[1] The State concedes that these questions were *Miranda* violative. The trial court found, however, that defendant's responses did not elicit any incriminating information, and defendant did not appeal this finding to this Court.

civil suspension case in defendant's favor and set the criminal case for trial before a jury.

¶ 6. Pursuant to the procedures first outlined in *State v. Cameron*, 126 Vt. 244, 249-50, 227 A.2d 276, 279-80 (1967), the court held a bifurcated jury trial, first addressing whether defendant committed DUI on August 31, 2001. During that phase of the criminal jury trial, defendant's attorney objected to the use of defendant's name and social security number for identification. The court overruled this objection. Defendant was convicted of DUI by a unanimous jury verdict.

¶ 7. Following this jury verdict, the court moved on to the enhancement phase. Because the State charged defendant with a third offense, it was required to prove beyond a reasonable doubt that defendant was convicted of DUI on two prior occasions. During this proceeding, the State used defendant's name, date of birth, address, and social security number — information obtained after defendant had received *Miranda* warnings and invoked his right to remain silent — to establish that the Roy Rheaume convicted of DUI in 1981 and 1997, and the Roy Rheaume presently convicted, were the same person. At the conclusion of this proceeding, the jury found that the State had established the two prior DUI convictions. Defendant was sentenced to ninety days to five years.

¶ 8. Defendant argues here, as he did below, that his *Miranda* rights were violated when the processing trooper asked him his birth date and social security number after he had invoked his right to silence. Therefore, he claims the trial court erred when it denied his motion to suppress the answers to these questions. We review motions to suppress de novo. *State v. Pierce*, 173 Vt. 151, 152, 787 A.2d 1284, 1286 (2001). The State, in opposition, contends that although the questions were asked after defendant invoked his right to silence, these questions did not violate *Miranda* because they fall within the "routine booking question" exception. Defendant, conceding that such an exception exists under federal law, urges us not to apply it on the facts of this case and not to adopt it under Chapter I, Article 10 of the Vermont Constitution. Thus, we address two issues in this appeal: (1) whether the questions objected to — seeking defendant's birth date and social security number — fit within the routine booking question exception to *Miranda* as a matter of federal law; and (2) whether we should recognize such an exception to *Miranda* under the Vermont Constitution.

¶ 9. We start with the routine booking question exception under federal law. Although, as noted below, there was a disagreement over the rationale for the holding, the United States Supreme Court recognized an exception to the requirements of *Miranda* in *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02, 608 (1990). In *Muniz*, a police officer asked an arrested DUI suspect a number of routine questions for processing purposes. Defendant sought to suppress the answers to these questions because he had not received *Miranda* warnings at the time that the questions were asked. The United States Supreme Court upheld the denial of the motion to suppress based on a routine booking question exception to the *Miranda* requirements. *Id.* The plurality decision of Justice Brennan explained his rationale for adopting the exception:

> The Commonwealth argues that the seven questions asked by Officer Hosterman ... — regarding Muniz's name, address, height, weight, eye color, date of birth, and current age — did not constitute custodial interrogation as we have defined the term in *Miranda* and subsequent cases. In *Miranda*, the Court referred to "interrogation" as actual "questioning initiated by law enforcement officers." We have since clarified that definition, finding that the "goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to 'its functional equivalent.'" In *Rhode Island v. Innis*, the Court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." However, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining" what the police reasonably should have known. Thus, custodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely

to "have ... the force of a question on the accused," and therefore be reasonably likely to elicit an incriminating response.

We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in *Innis*, merely because the questions were not intended to elicit information for investigatory purposes. As explained above, the *Innis* test focuses primarily upon "the perspective of the suspect." We agree with *amicus* United States, however, that Muniz's answers to these first seven questions are nonetheless admissible because the questions fall within a "routine booking question" exception which exempts from *Miranda*'s coverage questions to secure the "'biographical data necessary to complete booking or pretrial services.'" The state court found that the first seven questions were "requested for record-keeping purposes only," and therefore the questions appear reasonably related to the police's administrative concerns. In this context, therefore, the first seven questions asked at the booking center fall outside the protections of *Miranda* and the answers thereto need not be suppressed.

*Id.* at 600-02 (internal citations omitted). Justice Brennan's rationale that booking questions seek testimonial responses represents the majority decision because it is joined by Justice Marshall who nevertheless dissented on whether to create such an exception. See *id.* at 612 (booking questions sought testimonial responses because the answers would indicate defendant's state of mind). Four justices concurred, in an opinion authored by Chief Justice Rehnquist, because they found that the answers to the booking questions were not testimonial. See *id.* at 608 (Rehnquist, C.J., concurring).

▓ ¶ 10. Although Justice Brennan's opinion is only a plurality decision, all courts addressing routine booking questions after *Muniz* appear to have adopted it.[2] See *Thomas v. United States*, 731 A.2d 415,

---

[2] *Muniz* was the first time the Supreme Court addressed the routine booking question exception. Prior to *Muniz*, numerous state and federal courts had adopted this exception. See *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986); *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985); *United States v. Morrow*, 731 F.2d 233, 237 (4th Cir. 1984); *United States v. Avery*, 717 F.2d 1020, 1024-25 (6th Cir. 1983);

421 (D.C. Ct. App. 1999) (booking question exception "has been uniformly recognized since *Muniz* by the federal and state courts"). We discussed *Muniz* in *State v. Blouin*, 168 Vt. 119, 123-24, 125-26, 716 A.2d 826, 829-30 (1998) (majority and Skoglund, J., dissenting), but did not squarely adopt the routine booking question exception from that decision. We now adopt it as the prevailing statement of the applicable federal law.

¶ 11. Defendant argues that two responses to the officer's questions — his date of birth and his social security number — were incriminating, because they allowed the State to identify defendant as the person who had twice been convicted of DUI in the past, and therefore do not fit into the routine booking question exception announced in *Muniz*.[3] As the State points out, the test under *Muniz* is not whether the information disclosed could lead to a conviction, but instead whether

---

*United States v. Glen-Archila*, 677 F.2d 809, 815-16 (11th Cir. 1982); *State v. Garcia*, 664 P.2d 1343, 1356 (Kan. 1983); *State v. Widell*, 258 N.W.2d 795, 797 (Minn. 1977); *State v. Knoch*, 738 P.2d 979, 981 (Or. Ct. App. 1987).

[3] We note that in *Muniz* and many of the federal and state decisions adopting the routine booking exception, suspects were questioned without first being given the *Miranda* warnings. In this case, in contrast, the *Miranda* warnings were administered and then appellant was questioned. Defendant has not argued that this distinction has any effect on the applicable law. Thus, he has argued his position as if he was never provided any *Miranda* warnings prior to the officer asking him the booking questions. We agree that it makes no difference with respect to the routine booking question exception whether defendant did or did not receive the warnings prior to questioning because the identification questions fall outside the scope of *Miranda*. When presented with factually similar situations — *Miranda* warnings administered and then routine booking questions asked — other courts have also relied on *Muniz* and have drawn no distinctions regarding the administration of the warnings. See *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000) ("[L]imited, biographical questions are permitted even after a person invokes his or her *Miranda* rights . . . ."); *United States v. Bogle*, 114 F.3d 1271, 1273, 1275 (D.C. Cir. 1997) (defendant received *Miranda* warnings prior to questioning and court held that "express questioning constitutes interrogation only when it is reasonably likely to elicit an incrimination response"); *United States v. Taylor*, 799 F.2d 126, 127 (4th Cir. 1986) (court held that questions asked after defendant was advised of his *Miranda* rights pertaining to identification did not constitute interrogation); *State v. Golphin*, 533 S.E.2d 168, 200-02 (N.C. 2000) (questions relating to identification not *Miranda* violative because not interrogation even though asked after defendant had invoked his right to counsel subsequent to receiving *Miranda* warnings). We also note that in the comparable case of *State v. Crannell*, 170 Vt. 387, 392, 750 A.2d 1002, 1008-09 (2000), discussed *infra*, where defendant had invoked his *Miranda* rights, we relied on *Rhode Island v. Innis*, 446 U.S. 291 (1980), where defendant did not receive *Miranda* warnings, and made no distinction between situations where defendants receive the warnings and those where they do not.

the questions "are reasonably likely to elicit an incriminating response from the suspect." *Muniz*, 496 U.S. at 601; see also *Hughes v. State*, 695 A.2d 132, 140 (Md. Ct. App. 1997) (fact that answer to routine booking question helps the State to prove its case is not determinative); *State v. Banks*, 370 S.E.2d 398, 403 (N.C. 1988) ("[T]he focus must be on the time and circumstances under which [the information] was obtained, not the use to which it was ultimately put."). We cannot conclude that the questions involved here meet that test.

¶ 12. Certainly, identification of the arrested person is central to the police processing function. The questions asked in this case were apparently routine, were asked as part of routine processing, and were similar to the questions asked in *Muniz*. Indeed, except for the unusual circumstances of this case where defendant was not seized while in his vehicle, the police would already have significant identification information from the operator's license of the driver. See 23 V.S.A. § 1012(a), (b) (on request of officer who reasonably suspects operator is violating motor vehicle law, operator must provide name, address, operator's license and vehicle registration). There is no indication in the record that the officer knew in advance of the inquiry that defendant had been convicted of DUI in the past. See *Hughes*, 695 A.2d at 140 (inquiry is whether the officer, based on the totality of the circumstances, knew or should have known that the question was likely to elicit an incriminating response).

¶ 13. Defendant has cited cases in which courts found that birth date and social security information could be sought to help prove an element of a crime. See, e.g., *City of Fargo v. Wonder*, 651 N.W.2d 665, 669-70 (N.D. 2002) (asking partygoers who had consumed alcohol whether they were under the age of twenty-one not routine booking question); see also *Thomas*, 731 A.2d at 423-26 (collecting and discussing decisions where identity-seeking questions were not found to be within the routine booking question exception). Here, by contrast, there is no indication that the police had that intent or that the questions were likely to lead to incriminating evidence. Except for special cases, courts have generally found that identification information is within the routine booking question exception of *Muniz*. See *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *Magar v. State*, 836 S.W.2d 385, 386 (Ark. Ct. App. 1992); *People v. Anderson*, 837 P.2d 293, 296 (Colo. Ct. App. 1992); *State v. Evans*, 523 A.2d 1306, 1314-15 (Conn. 1987). We see no reason in this case not to follow these precedents.

¶ 14. This brings us to defendant's second argument — that we should follow Justice Marshall's dissent in *Muniz* and reject the routine booking question exception as a matter of Vermont constitutional law.

¶ 15. Chapter I, Article 10 of the Vermont Constitution provides in relevant part, "[t]hat in all prosecutions for criminal offenses . . . a person [cannot] be compelled to give evidence against oneself." In *State v. Brunelle*, 148 Vt. 347, 355 n.11, 534 A.2d 198, 204 n.11 (1987), this Court explicitly recognized that "evidence obtained in violation of *Miranda* is also in violation of the privilege against self-incrimination in Article 10 of the Vermont Constitution." Although we have restated this holding, see *State v. Zumbo*, 157 Vt. 589, 592, 601 A.2d 986, 988 (1991) ("we have explicitly adopted *Miranda* under Chapter I, Article 10"), we have not gone further and found a violation of the *Miranda* principles in circumstances where the United States Supreme Court has not done so.

¶ 16. Defendant contends that we should employ the framework for constitutional inquiry established in *State v. Jewett*, 146 Vt. 221, 225-27, 500 A.2d 233, 236-37 (1985), examining: (1) historical considerations; (2) the textual differences between Article 10 and the Fifth Amendment; (3) sibling state authority; and (4) policy considerations. Although we employ the framework, we reach a conclusion different from that urged by defendant.

¶ 17. Defendant, largely relying on case law from the 1800s and early 1900s, asserts that the privilege against self-incrimination is deeply rooted in our state's jurisprudence. See *State v. Hobbs*, 2 Tyl. 380, 383 (1803) (recognizing that Chapter I, Article 10 of the Vermont Constitution insulates our citizens from "all compulsory process to enforce an acknowledgment of guilt"); *State v. Duncan*, 78 Vt. 364, 370, 63 A. 225, 225 (1906) ("Our Constitution declares that no one can be compelled to give criminating evidence against himself. Such is the common law."). He also notes that the text of Chapter I, Article 10 is different from that of the Fifth Amendment to the United States Constitution. Arguing the significance of the textual difference, he quotes language from *Jewett*:

Both the self-incrimination and search and seizure provisions of the Vermont Constitution contain wording substantially different from the parallel clauses in the Federal Charter. Thus, it is possible that these clauses could be construed

differently from somewhat similar provisions in the Federal Constitution or they may be given the same interpretation even though the language differs.

146 Vt. at 226-27, 500 A.2d at 237.

¶ 18. Despite the historical recognition of the privilege against self-incrimination and the language of Chapter I, Article 10, we have consistently held that, in its application to adults, the Article 10 privilege against self-incrimination and that contained in the Fifth Amendment are synonymous. See *State v. Ely*, 167 Vt. 323, 330-31, 708 A.2d 1332, 1336 (1997) (stating that we have rejected "on a number of occasions" the contention that Article 10 provides broader rights than the Fifth Amendment); *State v. Picknell*, 142 Vt. 215, 227, 454 A.2d 711, 716 (1982) ("the majority of the forty-eight states that have a self-incrimination provision in their respective constitutions use language that differs from the phraseology employed by the Fifth Amendment," but they are interpreted as consistent with that amendment); *State v. Brean*, 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978) ("this Court" has "recognized that the various state and federal constitutional provisions relating to self-incrimination, although using slightly variant phraseology, have a common origin and a similar purpose"); *State v. Baker*, 115 Vt. 94, 113, 53 A.2d 53, 64 (1947) (Moulton, C.J., dissenting) (the Fifth Amendment has the same "meaning as the corresponding phraseology of the Constitution of this State"); *In re Dewar*, 102 Vt. 340, 346, 149 A. 489, 491 (1930) (the Fifth Amendment "is uniform in meaning with the provision of our Constitution herein directly involved"); see also *In re E.T.C.*, 141 Vt. 375, 378-79, 449 A.2d 937, 939-40 (1982) (holding that Article 10 affords greater rights than the Fifth Amendment for juveniles who are subjected to custodial police interrogation). We noted the *Jewett* language in *Ely*, but discounted it as inconsistent with the long line of decisions to the contrary. See 167 Vt. at 331 n.2, 708 A.2d at 1336 n.2. We see no reason to reexamine these holdings.

¶ 19. Defendant next turns to the holdings in other states, arguing first that we should consider Massachusetts' and New Hampshire's Constitutions because they have similar self-incrimination provisions, see Mass. Const., Pt. 1, art. 12 ("No subject shall be held to . . . accuse, or furnish evidence against himself."); N.H. Const., Pt. I, art. 15 (a person shall not "be compelled to accuse or furnish evidence against himself"), and they have been interpreted as providing broader protections than the Fifth Amendment. Even if we were to find in the decisions from these states a reason to overturn our settled interpreta-

tion of Chapter I, Article 10, this reconsideration would be of little benefit to defendant in this case. Both these states recognize the routine booking exception for questions concerning identification that are asked to process a suspect. See *Commonwealth v. White*, 663 N.E.2d 834, 844 (Mass. 1996) ("[s]ome information gained at booking is 'exempt' from the rule of *Miranda v. Arizona*") (internal citations omitted); *State v. Chrisicos*, 813 A.2d 513, 515 (N.H. 2002) ("Statements made in response to routine booking questions need not be suppressed even if the defendant did not first waive his or her *Miranda* rights."). Both decisions are based on the applicable state constitution provision, as well as on the Fifth Amendment. *White*, 663 N.E.2d at 844 (both Fifth Amendment and Article 12 recognize the booking question exception); *Chrisicos*, 813 A.2d at 515 (statements made in response to routine booking questions not subject to *Miranda* rights under Article 15). Accordingly, consideration of the decisions in these states only supports the proposition that a routine booking exception should be recognized under Chapter I, Article 10 of the Vermont Constitution.

¶ 20. Defendant urges us to rely on two decisions from other states that he argues reject the *Muniz* analysis and require that we suppress the answers to the booking questions in this case. Before we examine those decisions, we make two points about the context in which these decisions are raised. As noted above, this Court has explicitly held that the requirements of *Miranda* are independently applicable under Chapter I, Article 10 of the Vermont Constitution. We are one of only a handful of states to so hold. See B. Latzer, *Toward the Decentralization of Criminal Procedure: State Constitutional Law and Selective Disincorporation*, 87 J. Crim. L. & Criminology 63, 109-10 (1996) (six states have held that their constitutional self-incrimination provision includes *Miranda* protections: Conn., Fla., Haw., Miss., Ore., and Vt.). Some other states have adopted aspects of the *Miranda* rule, but not all of it. See *id.* As a result, the vast majority of state courts have never faced the question before us, and we do not know how they would rule. Indeed, they might never reach the question because they might reject the wholesale incorporation of the *Miranda* rules on which defendant asks us to build.

¶ 21. Moreover, the vast majority of state courts have explicitly relied upon a routine booking exception, often without specifying whether the decision is based only on the Fifth Amendment. See *State v. Vandeveer*, 533 P.2d 91, 95 (Ariz. Ct. App. 1975) ("questioning

regarding routine booking matters does not fall within the purview of *Miranda*"); *Magar*, 836 S.W.2d at 386 (questions asked to secure biographical data not *Miranda* violative); *People v. Sanchez*, 130 Cal. Rptr. 2d 219, 222 (Ct. App. 2003) (questions asked concerning identity and address not incriminatory); *Anderson*, 837 P.2d at 296 (request that suspect provide his address outside the purview of *Miranda*); *Evans*, 523 A.2d at 1314-15 (questions asked during booking were administrative in nature, *Miranda* not triggered); *People v. Abdel-massih*, 577 N.E.2d 861, 864-65 (Ill. App. Ct. 1991) (questions about defendant's place of employment not proscribed by *Miranda*); *Loving v. State*, 647 N.E.2d 1123, 1126 (Ind. 1995) (routine administrative questions are removed from the requirements of *Miranda*); *State v. Sallis*, 574 N.W.2d 15, 18 (Iowa 1998) (custodial interrogation does not include questions asked to obtain biographical information); *State v. Garcia*, 664 P.2d 1343, 1356 (Kan. 1983) (questions asked to complete booking not covered by *Miranda*); *State v. Smith*, 785 So. 2d 815, 818 (La. 2001) ("Because the officer's field interview asked for no more information than an individual might supply in response to booking questions ... [the officer's] inquiries did not amount to interrogation for *Miranda* purposes."); *State v. Brann*, 1999 ME 113, ¶ 13, 736 A.2d 251 (Maine has long recognized the routine booking question exception for questions asked to secure biographical data); *White v. State*, 821 A.2d 459, 470 (Md. 2003) (police officers engaged in procedural processing dictated by statute are not engaging in interrogation); *White*, 663 N.E.2d at 844 (questions seeking biographical data exempted from *Miranda*); *State v. Mass*, No. 204951, 1999 WL 33441276, at *1 (Mich. Ct. App. June 11, 1999) (per curiam) (statement that defendant lived in apartment where cocaine was found held admissible because it was made in response to a routine booking question); *State v. Widell*, 258 N.W.2d 795, 797 (Minn. 1977) (*Miranda* warnings not required before routine booking questions are asked); *Wesley v. State*, 521 So. 2d 1283, 1286 (Miss. 1988) (questions asked during booking are not interrogation for the purposes of *Miranda*); *State v. Isaiah*, 874 S.W.2d 429, 436 (Mo. Ct. App. 1994) (questions asked during booking not designed to elicit an incriminating response are not interrogation under *Miranda*); *Chrisicos*, 813 A.2d at 515 (statements made in response to routine booking questions are not *Miranda* violative); *State v. M.L.*, 600 A.2d 1211, 1215 (N.J. Super. Ct. App. Div. 1991) ("booking procedures and the routine questions associated therewith are ministerial in nature and beyond the right to remain silent."); *People v. Rodney*, 648 N.E.2d 471, 473 (N.Y. 1995)

(responses to routine booking questions not suppressible even if *Miranda* violated); *Banks,* 370 S.E.2d at 403 (*Miranda* requirements inapplicable to questions designed to elicit biographical data); *State v. Geasley,* 619 N.E.2d 1086, 1091 (Ohio Ct. App. 1993) (routine booking questions asked in violation of *Miranda* admissible); *State v. Knoch,* 738 P.2d 979, 981 (Or. Ct. App. 1987) (interrogation within the meaning of *Miranda* does not include routine booking questions); *Commonwealth v. Daniels,* 644 A.2d 1175, 1181 (Pa. 1994) (questions asked to obtain biographical data are exempt from *Miranda*); *Lemmons v. State,* No. 25-99-11715 CR, 2002 WL 471955, at *2 (Tex. Ct. App. Mar. 29, 2002) (statement made in response to a routine booking question admissible); *Watts v. Commonwealth,* 562 S.E.2d 699, 704 (Va. Ct. App. 2002) (explicitly adopting routine booking question exception for questions asked to secure biographical data); *State v. Wheeler,* 737 P.2d 1005, 1009 (Wash. 1987) (exception to *Miranda* for routine booking questions arises because such questions are unlikely to elicit incriminating responses); *State v. Stevens,* 511 N.W.2d 591, 599 (Wis. 1994) (explicitly adopting the routine booking question exception). Many of these decisions precede *Muniz* and, therefore, were not subject to controlling federal precedent.

¶ 22. Nevertheless, defendant urges us to rely upon two decisions, *State v. Ketchum,* 34 P.3d 1006 (Haw. 2001), and *Allred v. State,* 622 So. 2d 984 (Fla. 1993). On close examination, we conclude that neither would support defendant's position here.

¶ 23. The first case, *State v. Ketchum,* was decided under Article I, Section 10 of the Hawaii Constitution, the self-incrimination provision. The court decided that it would not adopt a routine booking question exception to *Miranda,* as described in *Muniz. Ketchum,* 34 P.3d at 1018-19. Instead, it announced the following rule:

> [W]e reaffirm the principle that "interrogation" consists of any express question — or, absent an express question, any words or conduct — that the officer knows or reasonably should know is likely to elicit an incriminating response. . . . The totality of the circumstances must be considered to determine whether "interrogation" has occurred, with a focus upon the officer's conduct, the nature of the question (including whether the question is a "routine booking question"), and any other relevant circumstance.

34 P.3d at 1020 (internal citations omitted). We find the rule in *Ketchum* largely indistinguishable from that announced in the decisions properly interpreting *Muniz*. For example, in *Hughes*, after adopting the routine booking question exception, the court stated that "[t]he routine booking question exception ... does not encompass questions that are designed to elicit incriminating admissions." 695 A.2d at 142. The court went on to explain that determining whether a question is designed to elicit an incriminating response requires an evaluation of the totality of the circumstances, including the context in which the question was asked. We question whether any case decided in Hawaii would reach a result different from that in Maryland as a result of the Hawaii Supreme Court's statement of its rule. Cf. Note, *Recognizing and Limiting the Routine Booking Question Exception*, 57 Md. L. Rev. 753, 771 (1998) (interpretation of *Muniz* in *Hughes* "takes away most of the bite of the exemption"). More importantly, we see no reason why the application of the Hawaii rule would change the result in this case.

¶ 24. The second decision, *Allred*, is even less supportive of defendant's position here. Although the decision suggests some disagreement with *Muniz* under the self-incrimination provision of the Florida Constitution, that disagreement did not extend to *Muniz*'s holding on the routine booking question exception. In fact, the court explicitly adopted the exception: "We find however [sic] that routine booking questions do not require *Miranda* warnings because they are not designed to lead to an incriminating response; rather, they are designed to lead to essential biographical data." 622 So. 2d at 987. The result in this case would be no different if *Allred* were the controlling precedent.

¶ 25. Finally, defendant contends that for public policy reasons we should not recognize an exception to *Miranda* for questions concerning identity that are asked only for administrative purposes. Defendant argues that such an exception "may provide an incentive for police to attempt to circumvent *Miranda*." We are not convinced.

¶ 26. In the leading case of *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Supreme Court explained that *Miranda*'s core concern was with protecting the suspect's privilege against self-incrimination in custodial interrogation. Thus, the Court was concerned with "words or actions ... that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301; see *State v. FitzGerald*, 165 Vt. 343, 345, 683 A.2d 10, 13 (1996). We noted in *FitzGerald*:

The safeguards of *Miranda* attach whenever a person in custody is subjected to interrogation. Under *Miranda*, the term "interrogation" encompasses only "words or actions ... that the police should know are reasonably likely to elicit an incriminating response." Although the focus of the inquiry is on the perception of the suspect, the police cannot be held accountable for the unforeseeable results of their words and actions. Thus, an incriminating statement made in the course of casual conversation is not the product of interrogation.

165 Vt. at 345, 683 A.2d at 13 (internal citations omitted).

¶ 27. A blanket rule prohibiting all questioning is overbroad and unworkable. We have already rejected it in *FitzGerald*. We believe that the objective standards developed in *Innis* and *Muniz* define a line sufficiently bright for predictable application.

¶ 28. We also conclude that the policy interests weigh heavily against defendant's position where the questions go to the identity of the person the police have arrested. As we said above, establishing the identity of the arrested person is a central concern of the booking function. Indeed, the failure to provide satisfactory proof of identity may provide grounds for arrest. See V.R.Cr.P. 3(c)(1). It may determine the ability to gain pretrial release. If a suspect refuses to identify him or herself, it is likely that the police can determine identity by nontestimonial methods.

¶ 29. We view questions related to defendant's identity for booking as being closer to requests for consent to search we allowed despite *Miranda* objections in *State v. Crannell*, 170 Vt. 387, 392, 750 A.2d 1002, 1008-09 (2000), than to custodial interrogation. In *Crannell*, a state trooper asked to search defendant's pick-up truck after he had received *Miranda* warnings and then invoked his right to silence and requested an attorney. Defendant argued that the "request for consent to search violated his rights because: (1) it was interrogation, and (2) it elicited testimonial information that he owned the truck." 170 Vt. at 391, 750 A.2d at 1008. Finding neither of defendant's arguments persuasive, we held that the request was not interrogation because "a defendant's consent to search is not an incriminating response" and that acknowledging ownership of the truck did not elicit testimonial information because the testimonial component was de minimis and it was a "foregone conclusion" that defendant owned the truck. *Id.* at 393-94, 750 A.2d at 1009. As in *Crannell*, the answers to the questions

relating to identity may have adverse consequences for the defendant, but the answers themselves are not incriminating responses, or the testimonial component is minor and a "foregone conclusion." *Id.*

¶ 30. For the above reasons, we conclude that none of the analysis considerations outlined in *Jewett* lead us to the conclusion that we should reject *Muniz* under Chapter I, Article 10 of the Vermont Constitution and hold that *Miranda* was violated when the police requested and obtained from defendant identifying information during booking, despite the fact that defendant had invoked his right to remain silent.

*Affirmed.*