2005 VT 128

STATE of Vermont v. Jay D.
QUIGLEY

[892 A.2d 211]

No. 04-165

¶ 1. December 15, 2005. The State appeals the Chittenden District Court's decision suppressing evidence obtained from defendant's locked bedroom during the execution of a warrant to search the apartment where he lived with two other full-time students. The State contends that investigating officers reasonably believed that defendant, Jay Quigley, lived in a "communal" living situation, such that a single warrant generally describing the entire apartment justified their search of his locked bedroom. After reviewing the district court's findings, and the record on which they are based, we conclude that the State's position is unsupported. Therefore, we affirm.

¶ 2. On the morning of September 26, 2002, Chris Linquist summoned emergency personnel after finding one of his roommates unconscious and foaming from the mouth in the living room of their apartment. Police officers Eric Bergstresser and James Goslin from the South Burlington Police Department arrived at the scene along with medical personnel who transported the individual to the hospital, where he was pronounced dead. Accounts from individuals who had been with the deceased during the previous evening led the officers to believe that alcohol and oxycontin may have contributed to the untimely death. Linquist gave the police officers verbal consent to search the apartment.

¶ 3. Officers Bergstresser and Goslin, and Detective Andrew Chaulk, who arrived on the scene shortly after the initial responders, conducted a preliminary search of the apartment pursuant to Linquist's verbal consent. The investigating officers found marijuana and three pipes used for smoking marijuana in the deceased's bedroom. Officers also found marijuana in the living room of the apartment. According to Officer Bergstresser's deposition testimony, the investigating officers noticed a third bedroom, Quigley's, during their initial search of the apartment, but they were unable to enter the room at that time because the door was locked. At this point, the investigating officers decided to halt their search and apply for a search warrant because, as Detective Chaulk indicated in his deposition testimony, they felt that they were "starting to go into other people's private areas" and that Linquist's verbal consent to search the whole apartment "probably wouldn't stand up." Detective Chaulk left the apartment to apply for a search warrant while Officer Goslin stayed behind to secure the scene.

¶ 4. While the officers were applying for a search warrant, Quigley returned to the apartment and attempted to remove some of his belongings from his bedroom. Officer Goslin limited the number of items Quigley took from his room and examined these items before Quigley left the apartment. After Quigley departed, Detective Chaulk returned with a warrant to search the apartment for "[a]ny information that may assist in the untimely death investigation." The investigating officers proceeded to search Quigley's bedroom in execution of the warrant. Because Quigley's bedroom door was locked, the investigating officers had to use a pen to unlock the door and enter the room. Once inside Quigley's bedroom, the investigating officers found cocaine in a container in the closet.

¶ 5. Quigley was charged with felony possession of cocaine in violation of 18 V.S.A. § 4231(a)(3). Prior to trial, Quigley

moved to suppress all evidence the investigating officers seized during their search of his bedroom. Judge Crucitti, who granted the search warrant at issue in this case, presided over Quigley's motion. Quigley argued that the affidavit in support of the application for the search warrant failed to establish probable cause that evidence of a crime would be found in his locked bedroom. Though the supporting affidavit specifically named Linquist and the deceased, it did not indicate the existence of a third bedroom, or that Quigley also resided in the apartment, even though the investigating officers were aware of these details. The district court found that the affidavit failed to link Quigley or his bedroom to any criminal activity. Moreover, the court found that the affidavit created the impression that only two individuals occupied the apartment, the deceased and Linquist.

¶ 6. The district court concluded that probable cause premised on a single warrant generally describing the entire apartment could not logically extend to Quigley's locked bedroom because the other tenants did not have access to that room. The court concluded that Quigley had a reasonable expectation of privacy based on the fact that the door to his bedroom was locked. The court drew this conclusion after considering inquest testimony presented as part of the motion, which indicated that Quigley routinely locked his bedroom door and was seldom in the apartment. The court further concluded that the presence of marijuana in the living room of the apartment did not justify the investigating officers' search of Quigley's locked bedroom because nothing in the affidavit linked him to criminal activity and, furthermore, it was unreasonable to assume that the individuals mentioned in the affidavit, the deceased and Linquist, could have concealed evidence of a crime in an area of the apartment to which they did not have access. Thus, the district court granted Quigley's motion to suppress the cocaine.

¶ 7. In reviewing the magistrate's finding of probable cause, the "key inquiry" is whether the affidavit provides information sufficient to justify the search. *State v. Cooper*, 163 Vt. 44, 51, 652 A.2d 995, 999 (1994). We must consider whether the facts in the affidavit create an objectively reasonable inference that the place to be searched will reveal evidence of the crime that has been committed. *State v. Melchior*, 172 Vt. 248, 251, 775 A.2d 901, 904 (2001). The affidavit must be viewed in a practical manner, and we will not subject it to "hypertechnical scrutiny." *State v. Towne*, 158 Vt. 607, 615, 615 A.2d 484, 489 (1992). Therefore, we give deference to the magistrate's determination of probable cause, and consider only the facts available to the magistrate at the time the warrant was issued. *State v. Potter,* 148 Vt. 53, 60, 529 A.2d 163, 167 (1987).

¶ 8. As an initial matter, the State complains that the district court erroneously considered inquest testimony regarding information that was not known to the investigating officers at the time they requested or executed the warrant; specifically, testimony indicating that Quigley was seldom at the apartment and routinely locked his door. We agree with the State's argument as a matter of law, for the constitutionality of the investigating officers' conduct must be assessed "in light of the information available to them at the time they acted." *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). It was incorrect for the court to consider testimony regarding Quigley's habits, unless such testimony indicated that this information was known to the officers at the time they acted.

¶ 9. Notwithstanding this error, we must affirm the district court's ultimate conclusion under the applicable standard

of review solely on the basis of evidence that was properly before the court, without any reference to or reliance on information not known to the investigating officers when they applied for the warrant. See *Larkin v. City of Burlington*, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) ("[W]e will not reverse the trial court's underlying decision if the record before us reveals any legal grounds that would justify the result."). This case comes to us on appeal from the court's grant of a motion to suppress. We review the district court's conclusions of law on the issue of suppression de novo. *State v. Rheaume*, 2004 VT 35, ¶ 8, 176 Vt. 413, 853 A.2d 1259. Therefore, in assessing the legal soundness of the court's conclusion, we consider the investigating officers' deposition testimony, which indicates that prior to obtaining a search warrant, the officers were aware that there was a third bedroom, that Quigley occupied this bedroom,[1] that Quigley's bedroom was locked, and that they had consent to search every place in the apartment except Quigley's locked bedroom. Based on this testimony alone, we affirm the trial court's conclusion that there was no probable cause to conduct a search of Quigley's bedroom, and that the "community living exception" does not apply.

¶ 10. The Fourth Amendment to the United States Constitution and Chapter One, Article Eleven of the Vermont Constitution[2] protect individuals, their homes, and their possessions from unreasonable and warrantless government intrusion. The home is, in most instances, a place where an individual expects privacy, and, more importantly, a place where society recognizes that this expectation is reasonable. See *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (explaining that constitutional protection exists where "a person [has] exhibited an actual (subjective) expectation of privacy ... that society is prepared to recognize as 'reasonable.'"); *State v. Morris*, 165 Vt. 111, 115, 680 A.2d 90, 94 (1996) ("In determining whether persons have a privacy interest in any given area or activity, we examine both private subjective expectations and general social norms."). Without question, Quigley's locked bedroom manifests the core privacy interest encompassed by the federal and state constitutions.

¶ 11. Individual privacy interests yield to probable cause, however, when "'a person of reasonable caution would conclude that a crime has been committed and that evidence of the crime will be found in the place to be searched.'" *Melchior*, 172 Vt. at 251, 775 A.2d at 904 (quoting *State v. Defranceaux*, 170 Vt. 561, 562, 743 A.2d 1074, 1075 (1999) (mem.)). Absent exceptional circumstances, the federal and state constitutions instruct executive officers to conduct searches pursuant to a warrant issued by an impartial magistrate. See *Morris*, 165 Vt. at 115, 680 A.2d at 93 (noting that the Warrant Clause of the Vermont Constitution is the "foremost line of protection" for individual privacy). A search warrant shall not issue "except one 'particularly describing the place to be searched.'" *Garrison*, 480 U.S. at 84 (quoting U.S. Const. amend. IV). Par-

---

[1] Initially, Quigley gave the investigating officers a pseudonym.

[2] Chapter One, Article Eleven of the Vermont Constitution provides: "That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without ... sufficient foundation ... to search suspected places

---

... not particularly described, are contrary to that right, and ought not to be granted."

570

ticularity does not translate to absolute precision. *State v. Stewart*, 129 Vt. 175, 178, 274 A.2d 500, 502 (1971) (finding warrant description adequate where identity of place to be searched could be ascertained "with reasonable effort"). But when a warrant application affidavit fails to demonstrate to the issuing magistrate that the object of the search will be found in the particular place to be searched, probable cause does not exist, and the scope of the investigating officers' lawful search is thereby limited. *Garrison*, 480 U.S. at 84.

¶ 12. The investigating officers' deposition testimony supports the inference that their awareness of Quigley's locked bedroom motivated their decision to get a search warrant, especially in light of the verbal consent the officers obtained from Linquist to search every other area of the apartment. Detective Chaulk's testimony indicates that he believed Linquist's verbal consent "probably wouldn't stand up" to search any place other than his bedroom, and that the investigating officers discontinued their initial search of the apartment because they felt that they were "starting to go into other people's private areas." Recognizing that Quigley had a privacy interest in his locked bedroom, the officers were correct to stop their initial search and apply for a warrant. Cf. *Garrison*, 480 U.S. at 86 (noting that where officers are aware of possible overbreadth of warrant they are "obligated to limit their search" accordingly). But the officers failed in their warrant application affidavit to establish probable cause to search Quigley's locked bedroom, because they did not show the issuing magistrate that the other tenants had access to it. In fact, the officers altogether failed to mention Quigley or his bedroom in the affidavit.

¶ 13. Excluding Quigley's own testimony, the evidence indicates that the door to Quigley's bedroom was locked when the police first arrived at the apartment, and that the investigating officers were aware of this fact. Where the facts show "some minimal communications between the officers," we may consider their collective knowledge of the salient facts prior to applying for the warrant. *State v. Phillips*, 140 Vt. 210, 216, 436 A.2d 746, 749-50 (1981) (recognizing that collective knowledge of probable cause to arrest a suspect may be imputed to the arresting officer where the facts support an inference of communication with other officers who could share that information). Although Detective Chaulk, the officer who applied for the warrant, claims that he was not aware of the locked bedroom door until he and the other investigating officers executed the search warrant, his own warrant application affidavit indicates that he participated in the initial search of the apartment and conversed with other officers in the apartment, including Officer Bergstresser. Moreover, at various times while Detective Chaulk was getting the warrant he was in telephone contact with Officer Goslin, who was securing the scene. Officer Bergstresser testified that when he and the other investigating officers became aware of the third bedroom during their initial search of the apartment, they did not enter the room during that time because it was locked. Furthermore, Quigley could not have initially locked his bedroom door in response to the officers' presence because he was not in the apartment when the investigating officers first arrived and discovered the locked third bedroom. The record thus leads to the logical conclusion that Quigley's bedroom was locked when the officers first arrived on the scene, and that the investigating officers were aware Quigley's bedroom was locked before they applied for a warrant to search the apartment.

¶ 14. The State argues that the investigating officers could have reasonably believed that the search warrant suffi-

ciently described the place to be searched and, therefore, justified their search of Quigley's bedroom. But when one tenant consistently denies all other tenants access to a part of the premises, probable cause based on a general description of the premises will not extend to the separately secured area. 2 W. LaFave, Search & Seizure § 4.5(b), at 586-87 (4th ed. 2004). The investigating officers knew that Quigley's bedroom was locked when they first arrived in the apartment, and it had been locked again when they executed the warrant. With this knowledge, the investigating officers were on notice that Quigley sought to exclude his co-tenants from his room. At the very least, their failure to fully develop the knowledge they had, given their access to the apartment and to Quigley prior to the execution of the warrant, does not excuse them from their obligation to disclose salient facts to the issuing magistrate in the warrant affidavit. We are persuaded by Judge Crucitti's observation that the affidavit created the impression that the search would implicate only two specific privacy interests: the deceased's, and that of Linquist, who had already consented to the search. Therefore, Judge Crucitti's decision stands because the information known to the investigating officers at the time they acted, and the reasonable conclusions that could be drawn therefrom, confirms that Quigley had a reasonable expectation of privacy in his locked bedroom, and refutes the State's assertion that probable cause extended beyond his locked door.

¶ 15. We do not agree with the State that it was reasonable for the investigating officers to assume they could search Quigley's bedroom pursuant to the community living exception. As formulated in other jurisdictions, the community living exception permits officers to execute a warrant that merely describes the place to be searched by its outward appearance, without regard to the separate privacy interests officers may encounter therein. This exception applies only where the officers could not have known or anticipated that they would encounter separate privacy interests inside the premises prior to executing the warrant. See *United States v. Santore*, 290 F.2d 51, 67 (2d Cir. 1960) (establishing "community living exception" to warrant particularity requirement where officers could not discern the dual occupancy nature of the house to be searched until after they had executed the warrant and gone inside); see also *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994) (allowing admission of evidence seized from a locked bedroom where officers had no reason to believe it was a separate residence prior to the search); *State v. Anderson*, 935 P.2d 1007, 1017-20 (Haw. 1997) (same).

¶ 16. Though this exception has been accepted by some federal courts interpreting the Fourth Amendment, and by other state courts, we have not previously recognized it as part of our Article Eleven jurisprudence. In several instances, we have held that Article Eleven provides broader protection than the Fourth Amendment, and have rejected certain judicially-crafted exceptions to the warrant requirement. See *State v. Schofner*, 174 Vt. 430, 435 n.1, 800 A.2d 1072, 1077 n.1 (2002) (mem.) (Johnson, J., dissenting) (collecting cases). Quigley has not, however, specifically argued that Article Eleven should provide broader protection here, and so we reserve full consideration of this issue for another day. Nonetheless, we find the State's argument unavailing.

¶ 17. The State cannot reasonably argue that the officers who executed the warrant were unaware of the locked third bedroom prior to executing the warrant. All of the officers who executed the warrant, including the affiant, Detective Chaulk, participated in the initial search of the apartment, which occurred prior to

the warrant being issued. Unlike the cases cited by the State, the investigating officers in this case were on notice of the privacy interests they might encounter because they were able to gain access to the premises under investigation prior to applying for or executing the search warrant. Here, the investigating officers were familiar with the layout of the apartment, and they knew how many tenants lived there and how many bedrooms existed. Specifically, Officer Bergstresser's testimony that Quigley's bedroom was locked when the officers first arrived in the apartment severely undercuts the State's position on this issue. Moreover, Detective Chaulk stated that Linquist "would be able to give consent to search his bedroom but as far as any place else, it probably wouldn't stand up" and that they limited their initial search "because . . . [they were] starting to go into other people's private areas." The investigating officers' own statements reveal their awareness that Quigley had a separate privacy interest in his locked bedroom that would be affected by their search. Under these circumstances, the community living exception, even if accepted, does not apply.

¶ 18. The State also argues that because "the residents had so blatantly left narcotics in the common area," it is logical to draw an inference that drugs were concealed in other areas of the apartment, including Quigley's locked bedroom. The State's argument has three prongs: (1) the other tenants, including the deceased, had access to the bedroom, and thus could have concealed additional drugs inside prior to the arrival of the police; (2) the drugs in the common area belonged to all the residents; and (3) Quigley's "obvious knowledge" of drugs in the common room leads to the inference that drugs would be found in his room as well. We have already rejected the first prong of the State's argument by declining to apply the community

living exception to the facts of this case. To reiterate, the investigating officers made no showing that the other tenants had access to Quigley's locked bedroom.

¶ 19. As to the second argument, the trial court correctly rejected this assumption, noting that the evidence found in the deceased's bedroom explained the presence of marijuana in the common area — the only illegal drug actually found there. Specifically, Detective Chaulk's affidavit states that the initial search of the apartment, undertaken pursuant to Linquist's consent, revealed a plastic baggie with a green leafy substance under the deceased's bed, three glass pipes for smoking marijuana in the deceased's closet, and a large cloth banner hanging on the deceased's wall depicting a multitude of marijuana leaves. Moreover, the marijuana in the living room was scattered about a coffee table near the couch where the deceased was found. In the absence of additional information drawing a nexus between the drugs in the living room and the apartment's third resident, or even any mention of a third resident's existence, this set of facts supports the inference that the marijuana in the common area belonged exclusively to the deceased. *State v. Weiss* provides no support for the State's assertion that a person's proximity to criminal activity is probable cause to search that person's residence; the facts in *Weiss* show more than proximity to criminal activity. 155 Vt. 558, 562-63, 587 A.2d 73, 75-76 (1990). There, officers applied for a warrant to search the home of one of the defendants after arresting the defendants in a nearby forest where marijuana plants were being grown. At the time of the arrest, the defendants were in possession of instrumentalities of marijuana cultivation. We held that the defendant's possession of household items used in the commission of a crime and found at the scene of a crime established a sufficient

nexus linking his nearby residence to the criminal enterprise because such items were often concealed at the home. *Id.* at 563, 587 A.2d at 75-76. By contrast, the officers in this case did not allege that Quigley himself was found in possession of contraband or instrumentalities of crime such that there was probable cause to suggest that he had concealed additional instrumentalities of crime in his locked bedroom.

¶ 20. The State relies on *State v. Hall*, 168 Vt. 327, 332, 719 A.2d 435, 439 (1998), to support its third argument, contending that Quigley's "obvious knowledge" of the presence of drugs in the common room supports the inference that drugs would be found in his room. But *Hall* does not stand for the proposition that a person's knowledge of criminal activity necessarily supports an inference of the person's involvement in criminal activity. In *Hall,* the defendant argued that a search warrant for his home based on the presence of a marijuana plant in his back yard lacked a nexus between the planting site and the nearby home sufficient to create an inference that evidence of marijuana production and cultivation would be found in the home. In rejecting that argument, we noted that the plant was obviously cultivated, having been staked and tied with fishing line, and that the plant was in a mowed area of the back yard close to the house. *Id.* We stated, therefore, that the evidence indicated "not only knowledge of the illegal plant's existence," but also that the plant's carefully cultivated appearance suggested participation by the homeowner in that cultivation. *Id.* The probable cause determination also relied on a tip from an informant, indicating that the defendant had drug paraphernalia in his home. *Id.*

¶ 21. Having not previously established a rule that a person's knowledge of criminal activity is necessarily probable cause to suspect that person of the criminal activity, we decline to do so in this case. In the context of a shared student apartment, it is not unusual for persons thrown together by a tight housing market to knowingly tolerate casual drug use on the part of their roommates, even though they themselves may not use drugs. Thus, probable cause to overcome Quigley's individual privacy interest in his locked bedroom cannot be based solely on the allegation that he had knowledge that marijuana had been used in the living room of the apartment he shared with two other students.

*Affirmed.*

¶ 22. **Dooley, J.**, concurring. Although I agree that the community living exception does not apply on the facts of this case, I find the much closer question to be whether the discovery of marijuana in the common area supplied probable cause for a search of each of the bedrooms. On this point, the fact that defendant's bedroom was locked is not decisive.

¶ 23. I believe that the issue reduces to the application of *State v. Towne*, 158 Vt. 607, 615 A.2d 484 (1992), to the situation where there are multiple places to search. *Towne* overruled *State v. Brown*, 151 Vt. 533, 562 A.2d 1057 (1989), a case in which the police had obtained a search warrant to search the defendant's house by relying primarily on evidence that the defendant was growing marijuana on a neighbor's land. In affirming the decision not to suppress the fruits of the search, we held in *Brown* that the standard was "whether, taking the information [in the affidavits] as true, marijuana or indicia of its use or sale would more likely than not be found at defendant's residence." 151 Vt. at 535, 562 A.2d at 1058. In *Towne*, we abandoned the "more likely than not" standard of *Brown*: "To the extent that *Brown* requires a rigid quantitative analysis for determining probable cause, we agree that it is not the correct stan-

dard and now overrule that portion of *Brown*." 158 Vt. at 613, 615 A.2d at 487. Although we did not explicitly adopt any alternative test, we upheld the search in *Towne* because there was a "reasonable probability" that the murder weapon would be found in the location covered by the warrant. *Id.* at 618, 615 A.2d at 490.

¶ 24. The circumstances in this case are such that there is a reasonable probability that evidence of drug use or sale would be found in the bedroom of the owner of the drugs found in plain view in the common area. Although we know that there is evidence of marijuana use by the deceased roommate, no evidence suggests the marijuana found in the common area belonged to that roommate as opposed to the others. I note that we do not usually divide up the spaces in a dwelling for purposes of probable cause analysis. Thus, in *State v. Melchior*, 172 Vt. 248, 252, 775 A.2d 901, 905 (2001), evidence of marijuana growing in the backyard created probable cause to search the entire house.

¶ 25. The issue is whether after contraband is discovered and it remains uncertain which suspect in a group owns the discovered contraband, a reasonable probability exists that further evidence regarding illegal substances will be found in a search of all of the suspects. The United States Supreme Court faced this issue in the arrest context in *Maryland v. Pringle*. 540 U.S. 366 (2003). In *Pringle*, three men were present in an automobile and, during a routine traffic stop, police found rolled-up cash in the glove compartment the driver had opened to get his registration and, thereafter, found cocaine in the armrest. Eventually, the front seat passenger confessed to owning the cash and drugs, but he subsequently attacked the confession as the fruit of an arrest unsupported by probable cause. In language supportive of the State's position here, the Court noted:

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized . . . .
>
> . . . .
>
> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe [defendant] committed the crime of possession of cocaine, either solely or jointly.

*Id.* at 371-72 (citations and quotations omitted) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The Court, however, ultimately adopted a rationale that helps little in answering the question before us:

> [Defendant] and his two companions were in a relatively small automobile . . . . [W]e think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Id.* at 373 (citations omitted).

¶ 26. After a long analysis of circumstances similar to those present in this case, Professor LaFave argues for a rule on probable cause that depends primarily on whether there is a risk that the privacy of an innocent person will be invaded. See 2 W. LaFave, Search & Seizure § 3.2(e), at 78-84 (4th ed. 2004). Certainly, some of the few cases on point support Professor LaFave's distinction. See *United States v. Shamaeizadeh*, 80 F.3d 1131, 1137 (6th Cir. 1996) (holding that, where one resident of house claims that some of other occupants are growing marijuana inside house and house in question is divided into separate living units, no probable cause exists for searching basement apartment); *State v. Robinette*, 270 N.W.2d 573, 577-78 (S.D. 1978). *Robinette* is probably closest to the facts before us. In that case, marijuana plants were found growing in the common yard of two buildings that contained a total of four apartments, and there was no evidence that occupants of a particular apartment were more likely than others to be the growers. The South Dakota Supreme Court suppressed the evidence found in a search of one of the apartments, concluding that "[s]uspicions do not amount to probable cause for the issuance of a search warrant." 270 N.W.2d at 578.

¶ 27. But there are also decisions pointing in the opposite direction. For example, the South Dakota Supreme Court, without distinguishing *Robinette*, held in *State v. Smith*, 344 N.W.2d 505, 508-09 (S.D. 1984), that police could search for the perpetrator of a robbery in both apartments of a duplex based on tracks in the snow from the robbery site to the duplex's front door, but with no evidence as to which apartment the perpetrator entered. The court reasoned:

> We do not mean to say, of course, that one search warrant may be used in all cases to justify the search of all living units

in a multiple-residence structure, for in most situations probable cause would not exist for such a blanket authorization and thus the warrant would not pass constitutional muster. When considered in the light of the totality of the circumstances, however, we do not view the warrant in the instant case as being beyond the pale of particularity. There were only two living units within the structure located at 407 Dorothy Street. There apparently was no separate entry dedicated to each apartment. The probable cause to believe that the fruits of the break-in were in the structure was overwhelming. The possible intrusion upon the privacy of the occupants of both units was thus reasonable within any fair interpretation of the Fourth Amendment. In a word, we must draw a distinction between the warrant in the instant case and one that would purport to authorize a search of all units in a large apartment complex based upon tracks leading to the front door of the complex. That distinction made, the ghost of seriatim kick-ins is laid.

*Id.* (citations omitted); see also *State v. Thomas*, 421 S.E.2d 227, 236 (W. Va. 1992) ("Because there should be no 'numerically precise' probability, it is possible to have probable cause based on the same facts to search more than one person."). Not surprisingly, both *Robinette*, 270 N.W.2d at 580, and *Smith*, 344 N.W.2d at 509-12, have dissents. Cf. R. Gould & S. Stern, *Catastrophic Threats and the Fourth Amendment*, 77 S. Cal. L. Rev. 777, 805 (2004) ("[I]n cases of search of multiple persons, there may be sharply divergent views and probable

dissent because courts recognize that these are very difficult cases, no matter the outcome.").

¶ 28. For two main reasons, I conclude that on the current unsettled state of the law the search of defendant's bedroom cannot be justified by the presence of drugs in the common area. First, I agree with Professor LaFave that we should be more hesitant to find probable cause in searches of multiple places, controlled by different persons, where a serious risk of invading the privacy of an innocent person exists. Second, in this case, the presence of drugs in the bedroom of the deceased roommate explains the presence of drugs in the common area. While the common area drugs could have been the property of one of the two other roommates, it is entirely possible that neither of these roommates were involved in the drug use and both were innocent. Thus, the probability of drugs being present in their bedrooms is lower than the probability that evidence would be found in one of the apartments in *Smith*, where one of the two apartments was almost certain to contain the stolen property or evidence of the crime.

¶ 29. For this reason, I concur in the result reached by the majority.