| VERMONT SUPERIOR COURT<br>32 Cherry St, 2nd Floor, Suite 303,<br>Burlington, VT 05401<br>802-951-1740<br>www.vermontjudiciary.org |  | ENVIRONMENTAL DIVISION<br>Docket No. 22-ENV-00092 |
|---|---|---|

| | |
|---|---|
| **Wheeler Parcel Act 250 Determination** | **MERITS DECISION** |

This is an appeal of a District 4 Environmental Commission (District Commission) decision granting an Act 250 permit to BlackRock Construction, LLC (BlackRock) for the development of a 32-unit residential housing project at the intersection of Dorset Street and Park Road in South Burlington, Vermont (the Project). Inverness Homeowners' Association, Glen Eagles Homeowners' Association, Villas at Water Tower Hill Homeowners' Association, Neighbors Committee to Stop Neighborhood Blasting, and James Leas appealed that decision to this Court. Pursuant to this Court's March 21, 2024 Entry Order, Inverness Homeowners' Association and Glen Eagles Homeowners Association were converted to "For Information Purposes Only" status due to the failure to retain counsel as directed by the Court. See In re Wheeler Parcel Act 250 Determination, No. 22-ENV-00092, slip op. at n.1 (Vt. Super. Ct. Envtl. Div. Mar. 21, 2024) (Walsh, J.). Thus, the parties retaining appellant status in this matter are Villas at Water Tower Hill Homeowners' Association, Neighbors Committee to Stop Neighborhood Blasting, and James Leas (together, Neighbors).[1]

This Court held 6 days of trial on May 6 and 7, 2024, June 17, 19, 20 and July 1, 2024. Parties appeared both remotely via the WebEx platform and in-person at the Costello Courthouse in Burlington, Vermont. On September 12, 2024, the Court conducted a site

---

[1] Each of the Neighbors are independent appellants in this matter. Despite this, they have been working together to present their case on appeal. The Court understands that they join in collective arguments and refers to them collectively as Neighbors in light of this.

visit and made observations as requested by the parties. The site visit and observations are not evidence, but rather are used to put the evidence presented during trial into context.

In this matter, BlackRock is represented by Christopher Roy, Esq. Villas at Water Tower Hill Homeowners' Association is represented by non-attorney representative Alan Luzzatto. Neighbors Committee to Stop Neighborhood Blasting is represented by non-attorney representative Jeanne Zagursky. James Leas is a Vermont attorney representing himself in this matter. The Natural Resources Board (NRB) is represented by Jenny Ronis, Esq. Chittenden County Regional Planning Commission (CCRPC) was represented at trial by Joseph McLean, Esq. Post-trial, Attorneys David W. Rugh, Esq. and Beriah C. Smith, Esq. filed a noticed with the Court to serve as substitute counsel for CCRPC. Attorney McLean, Esq. no longer represents CCRPC and his withdraw of appearance is granted.

### Statement of Questions

There are five Questions before the Court. They ask:

> 1. Does the Project comply with Act 250 Criterion 1 (air) with respect to noise, particulates, exhaust, and chemicals?
> 2. Does the Project comply with Act 250 Criterion 5A with respect to traffic?
> 3. Does the Project comply with Act 250 Criterion 8 for aesthetics?
> 4. Does the Project comply with Act 250 Criterion 8 for noise?
> 5. Does the Project comply with Act 250 Criterion 10 with respect to the relevant municipal and regional plans?[2]

Wheeler Parcel, No. 22-ENV-00092, slip op. at 3 (Jul. 12, 2023) (Walsh, J.); see also Wheeler Parcel, No. 22-ENV-00092, slip op. at 2 (Aug. 3, 2023) (Walsh, J.) (confirming that these are the Questions before the Court).

### Factual Findings

1. JAM Golf, LLC (JAM Golf) owns a parcel of land at the intersection of Dorset Street and Park Road in South Burlington, Vermont (the Property).

2. BlackRock Construction, LLC (previously defined as BlackRock) has an agreement with JAM Golf by which BlackRock will undertake all permitting activities relative to the

---

[2] The relevant regional plan is the 2018 Chittenden County ECOS Plan.

Project. The agreement establishes the terms of BlackRock's purchase of the newly created Project lots.

3. The Property is approximately 6.91 acres.

4. Prior to JAM Golf's ownership, the Property was part of a larger parcel of land and a part of the City of South Burlington Wheeler Nature Park (Wheeler Nature Park).

5. In 2015, the City of South Burlington (the City) and JAM Golf entered into a settlement agreement to resolve then-pending appeals. The settling parties agreed to a land swap resulting in the City conveying JAM Golf the Property and JAM Golf conveying to the City a 21.88-acre parcel of land for conservation. The 21.88 parcel is east of the Property and adjacent to the Butler Farms subdivision.

6. Pursuant to the settlement agreement, the City would further amend its zoning bylaws to allow for residential development of the Property consistent with the amended bylaws.

7. The agreement was approved by this Court in a Consent Order that was not appealed. Ex. AA.

8. In 2016, the City did amend its zoning bylaws following the Consent Order.

9. The Property was created by subdivision and approved in a 2017 Act 250 Permit # 4C0923-5, 4C0694-7. See Ex. DD.

10. Following the subdivision, the Property was sold by the City to JAM Golf.

11. As a result of the subdivision and sale, the Property was removed from the larger Wheeler Nature Park.

12. The Property is presently a private parcel of land.

13. The Property is presently a vacant lot with vegetation.

14. On July 8, 2021, BlackRock obtained a permit from the City Development Review Board (DRB) to construct a 32-unit residential development, including 18 single family homes and 7 duplexes, with associated infrastructure at the Property, including a new roadway, sidewalks, landscaping, and buried utilities. This is the Project. See Ex. EE.

15. The DRB permit was not appealed, and is therefore, final and binding.

3

16. On September 21, 2021, BlackRock applied for an Act 250 permit amendment for the Project. See Ex. A.

17. BlackRock signed the underlying Act 250 application as "applicant," and noted that it had a contract to purchase the Property as its legal interest in the land. Id.

18. JAM Golf signed the application as "landowner." Id.

19. JAM Golf was not a co-applicant to the application and has not appeared before this Court in this action.

20. Neighbors moved to join JAM Golf as a co-applicant in this case, which this Court denied in an Entry Order dated April 11, 2023. See In re Wheeler Parcel Act 250, No. 22-ENV-00092 (Vt. Super. Ct. Envtl. Div. Apr. 11, 2023) (Walsh, J.).

21. Neighbors to Stop Community Blasting is an organization and is represented by non-attorney Jeanne Zagursky. It sought and retained party status under Criterion 1, Criterion 5, Criterion 8 (for aesthetics), and Criterion 10.

22. James Leas is an individual residing at 37 Butler Drive, South Burlington, Vermont. He is self-represented in this matter, though he is a Vermont licensed attorney, and has retained party status under Criterion 1, Criterion 5, Criterion 8 (for aesthetics), and Criterion 10.

23. The Villas at Water Tower Hill Homeowners Association is a homeowner's association for the homes in the area of Nicklaus Circle, South Burlington, Vermont, located across Dorset Street from the Property. It has retained party status under Criterion 1, Criterion 5, Criterion 8 (for aesthetics), and Criterion 10. It is represented by non-attorney Alan Luzzatto.

24. On July 20, 2022, the District 4 Environmental Commission (previously defined as the District Commission) approved BlackRock's application for the Project with conditions. See Ex. B.

25. Neighbors subsequently appealed to this Court.

4

**Criterion 1**[3]

26. The Project does not require an Agency of Natural Resources Air Pollution Control Permit.

27. Blasting and drilling will be required for the construction of the Project, including the installation of roadways and utilities, and building foundations.

28. BlackRock has employed Maine Drilling & Blasting Company (Maine Drilling & Blasting) in connection with this aspect of the Project.

29. Maine Drilling & Blasting has experience conducting blasting and drilling in Vermont, including Chittenden County projects similarly scoped to the Project that are surrounded by existing structures and infrastructure.

30. Maine Drilling & Blasting is a qualified blasting contractor.

31. Maine Drilling & Blasting designed a blasting plan for the Project which addresses how the blasting and drilling will be conducted (the Blasting Plan) and a Blast Traffic Plan. See Ex. M (Blasting Plan); Ex. N (Blast Traffic Plan).

32. BlackRock estimates that approximately 12,000 cubic yards of material will need to be blasted and removed in the construction process.

33. At least two weeks prior to the first blasting activity, BlackRock will notify all residents, institutions, and businesses within 1,000 feet of the blasting activity, as well as the City and the District Commission.

34. Prior to blasting, BlackRock or its agents will conduct pre-blast surveys, with landowner consent, for all structures within 750 feet of the blasting at least two weeks before the first blasting event.

35. This represents a 500-foot increase from the standard 250-foot blasting survey area.

36. Upon completion of the blasting activity, BlackRock or its agents will conduct post-blast surveys of these properties, with landowner consent.

---

[3] The Court has broken up its factual findings into the most relevant Criterion at issue in this appeal for organizational purposes only. To the extent that facts may be relevant to more than one Criterion before the Court, the Court does not necessarily restate the fact in each section and the facts are to be viewed cohesively. This is particularly relevant with respect to the issue of noise, which is addressed under Criterion 1 and 8.

37. While subject to modification due to site considerations, blast holes will be approximately 11 feet deep, 3.5 inches wide, and will contain approximately 21.16 pounds of explosives per hole.

38. Ground vibration from the blasting shall not exceed 2.0 inches per second and air blast overpressure shall not exceed 133 dB at the nearest residential structure to the blasting site.

39. BlackRock or its agent will conduct seismic and noise monitoring during blasting as required by the District Commission and prepare blast monitoring reports for each blast. The reports will be available to the District Commission upon request.

40. Blasting hours are limited to 8:00 AM to 4:00 PM Monday through Friday and no blasting will occur on Saturdays, Sundays, or federal holidays.

41. Construction hours, generally, which would include drilling, are limited to 7:00 AM to 6:00 PM Monday through Friday and 8:00 AM to 5:00 PM on Saturdays with no construction occurring on Sundays or federal holidays.

42. Only two blasts may occur per day.

43. Blasting may only occur during a three-month period, measured from first blast to last blast, with the ability for BlackRock to extend the blasting operation period with review and approval by the City.

44. The blasting and drilling process may include the use of chemicals that may be hazardous to people or the environment. These chemicals are noted on the Blasting Plan's Material Safety Data Sheets.

45. Blasting will be conducted consistent with the Blasting Plan, as modified by conditions imposed by the District Commission and the Agency of Natural Resources Best Management Practices for Blasting Activities to Avoid Environmental Contamination.

46. Blasting will be sized and scoped to minimize risk of dust and particulate emissions off-site, including flyrock.

47. Blast mats will be employed over blast locations to mitigate the risk of flyrock, dust, and generally provide a safer blast.

48. BlackRock will implement dust control measures to limit dust impacts from the construction including using stabilized construction entrances, disturbing no more than 5 acres of area at one time, and applying water and/or dust control agents to the area.

49. The drills used in construction are equipped with a flexi rock system that runs water through the drill to introduce a fine mist at the drill's bit to limit dust creation.

50. Further, the drill is equipped with a vacuum at the drill bit to capture and remove dust from the drill site and prevent it from causing dust impacts off-site.

51. Trucks loaded with materials traveling off-site will be covered when on public roadways.

52. BlackRock will also employ safety measures to ensure that the blasts will not pose a safety risk beyond those addressed above.

53. These measures include roadway traffic controls along Dorset Street, Park Road, Nicklaus Circle. Flaggers will stop traffic on these roadways one minute prior to each blast and for a two-minute period associated with each blast, or until each blast scene is deemed safe. There will be a pre-blast warning and all-clear signals during blasting.

54. Additionally, flaggers will stop traffic on the recreational path for the same amount of time.

55. The locations of all traffic stops are set forth in BlackRock's Exhibit N.

56. Rock crushing, sieving, or screening operations may not occur at the Property absent written permission from the District Commission.[4]

**Criterion 5(A)**

57. The Project will be accessed from Park Road via a newly constructed looped roadway, Zoey Circle, with two curb cuts providing a point of access from Park Road and a means of egress onto Park Road.

58. Parking will be provided at each residence and parking on Zoey Circle will also be available as needed.

---

[4] Neighbors' post-trial briefing asserts that BlackRock did not disclosure noise associated with rock crushing, and therefore, BlackRock did not meet its burden of production. BlackRock has agreed to conduct no rock crushing operations on-site absent permission from the District Commission, consistent with the condition imposed by the District Commission below. Thus, Neighbors assertions regarding impacts from on-site rock crushing are irrelevant to the Court's analysis.

59. The Project will provide a connection to the existing recreational path along Dorset Street.

60. A crosswalk will be installed with a 12-foot streetlight at the intersection of the new recreational connection and Zoey Circle.

61. Two new crosswalks will also be installed with 12-foot streetlights at Zoey Circle's intersections with Park Road.

62. Stop signs will be installed at the new intersections of Zoey Circle and Park Road. Pedestrian stop signs will be installed along the existing low use recreational path. Pedestrian warning signs will also be installed at the new crosswalk connecting the Project to the recreational path along Dorset Street. The exact location of all signage is set forth on Exhibit I-1, BlackRock's Revised Signage Plan dated June 7, 2024.

63. Following the Project's completion, Zoey Circle will become a City road to be maintained by the City.

64. Park Road is accessed by Dorset Steet in the vicinity of the Project.

65. There is a left turn only lane on the southbound side of Dorset Street to access Park Road.

66. Dorset Street has a posted speed limit of 40 miles per hour.

67. Park Road has a posted speed limit of 25 miles per hour.

68. Park Road itself, and its intersection with Dorset Street, is not a high crash location.

69. Park Road is maintained by the City and was designed to meet City standards.

70. The first curb cut for the Project is approximately 225 feet from the intersection of Park Road and Dorset Street.

71. The second curb cut is approximately 400 feet from the first curb cut.

72. From Dorset Street, Park Road lowers in elevation, with the lowest part of the road in the area of the new proposed intersections with Zoey Circle.

73. Park Road then rises in elevation towards residential developments along portions of Park Road and Golf Course Road.

74. The steepest portion of Park Road begins to the east of the second proposed curb cut, further away from Park Road's intersection with Dorset Street. In this area Park Road is

8

curved and has posed some traffic incidents during inclement winter weather and windswept snow conditions.

75. East of the easternmost curb cut of Zoey Circle there is a portion of Park Road benefitted by guardrails.

76. BlackRock conducted a traffic impact assessment of the Project. Richard Dickinson P.E., formerly of Lamourex & Dickinson Consulting Engineers, completed the study.  See Ex. K (the Traffic Report).

77. The Traffic Report assessed traffic impacts, including safety, from the Project.

78. The Project will generate 23 vehicles per hour during AM peak hours and 28 vehicles per hour during PM peak hours.

79. The Project will have only a minimal effect on traffic congestion in the Project's immediate intersections.

80. The level of service (LOS) at the intersection between Dorset Street and Park Road will be maintained at its current LOS B after the Project's completion.

81. The level of service at Zooey Circle's new intersections with Park Road will be LOS A.

82. As set forth in the Traffic Report, the new intersections for the Project on Park Road have more than the recommended 280 feet of sight distances.

83. These sight distances will provide the safe stopping distance recommended for vehicles exceeding Park Road's posted speed limit by up to 10 miles per hour.

84. BlackRock will maintain vegetation when necessary to ensure that the safe stopping distances are maintained.

85. The Traffic Report and testimony of Mr. Dickinson P.E. show that the Project's additional traffic will not result in unsafe traffic conditions.

**Criterion 8**

86. The Property is located at the intersection of Park Road and Dorset Street.

87. The Property is presently an undeveloped lot.

88. Prior to its subdivision, the Property was a part of the Wheeler Nature Park.

89. Following its subdivision, the Property was sold to JAM Golf.

90. The Property is no longer a part of the Wheeler Nature Park and is instead a privately owned parcel of land.

91. In the area of the Property there are several residential developments. These include Nicklaus Circle across Dorset Street from the Property, developments on Golf Course Road and Park Road to the east of the Property, and others to the east and south of the Property.

92. Existing residential developments on Park Road and Golf Course Road are of a higher unit per acre density than the Project.

93. The Project is subject to the City of South Burlington Land Development Regulations, effective January 25, 2016 (LDR).  Ex. Y.

94. The Project has received approval from the City under the LDR.

95. Under the LDR, the Property is located within the Southeast Quadrant Neighborhood Residential North (SEQ-NRN) district, which was established in response to an agreement between JAM Golf and the City.

96. The Project is not within a View Protection Overlay District as set forth in the LDR.

97. Within the SEQ-NRN, there are three zones in which buildings may only be one story.

98. The Project seeks approval to place seven such units in this area, five single family units, and one duplex containing two units.

99. Outside of this, the proposed units may be two stories.

100. The buildings are contemporary style, with various differences in aesthetic details and exterior painting consistent with the surrounding homes.

101. Exterior lighting includes streetlights at each new crosswalk. These lights limit view beyond its illuminated area.

102. All residential building-mounted fixtures are no higher than 20 feet above grade and will be installed or shielded to limit view beyond its illuminated area.

103. No exterior signage is proposed.

104. Project-related utilities are buried, and utility boxes located above-ground will be screened with plantings.

105. The Project site is viewable from Park Road and Dorset Street, as well as the recreational path running along Dorset Street and the low use recreational path running along Park Road.

106. BlackRock has provided a landscaping plan from TG Boyle Associates (the Landscaping Plan). Ex. J

107. The Landscaping Plan proposes to retain existing trees and provide plantings throughout the Project, including buffers along the portion of the Project adjacent to the recreational path and a split rail delineation fence surrounding portions of the Property.

108. While the Project may be visible from the Dorset Street recreational path at the initial time of the plantings, the goal of the Landscaping Plan is for these plantings to screen the Project in this area over time.

109. All plantings will be permanent.

110. There is an existing view of the Green Mountains from the recreational path running along Dorset Street looking across the Property. There is an existing view of the Green Mountains, though sometimes blocked by trees, from Dorset Street looking across the Property.

111. The Project will impact these views.

112. At the time of application, the Project was subject to the 2016 City of South Burlington Comprehensive Plan (2016 City Plan). Ex. W.

113. During the pendency of this appeal, the City adopted the 2024 City of South Burlington Comprehensive Plan (2024 City Plan). Ex. HH.

114. While BlackRock asserts that it complies with both the 2016 City Plan and the 2024 City Plan, it has elected to be reviewed under the 2024 City Plan.

115. The Project is subject to the 2018 Chittenden County ECOS Plan (2018 ECOS Plan). See Ex. 7 (2018 ECOS Plan); Ex. 8 (2018 Supplement 3 to 2018 ECOS Plan).

116. The Project is in the Rural Planning Area as outlined in the Future Land Use map of the 2018 ECOS Plan.

117. The City completed the South Burlington Open Space Committee Report in 2014 (the Open Space Report), which identified areas as scenic viewpoints and established overlay districts.  Ex. 20.

118. The City adopted a Public Nuisance Ordinance, which in part addresses noise.  Ex. 47.

119. The City adopted a Wheeler Nature Park Management Plan.  See Ex. 2.

120. The City also undertook a habitat review in 2004 by Arrowwood Environmental, LLC (the 2004 Arrowwood Assessment).  See Ex. 3.

121. Both the Wheeler Nature Park Management Plan and the Arrowwood Assessment were issued prior to the Property's removal from the Wheeler Nature Park and private ownership.

**Criterion 10**

122.  At the time of application, the Project was subject to the 2016 City Plan.

123. During the pendency of this appeal, the City adopted the 2024 City Plan.

**Discussion**

Prior to addressing the merits of each of the Criteria before the Court, the dispute between the parties necessitates a restatement the applicable burdens in this matter.  A party's burden of proof consists of both a burden of production and a burden of persuasion.  See In re Rt. 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.) *remanded on other grounds by* 2007 VT 66.  "The burden of production requires the obligated party to produce sufficient evidence for a district commission, or this Court on appeal, to make a factual determination; the burden of persuasion refers to the obligation of persuading the fact finder that certain facts are more likely true than not."  In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 4 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.) *aff'd* 2009 VT 98 (citing In re Denio, 158 Vt. 230, 237—39 (1992)).

The burden of persuasion under Act 250 depends on the at-issue Criterion.  See 10 V.S.A. § 6088.  An applicant, here BlackRock, bears the burden of persuasion under Criteria 1 and 10.  10 V.S.A. § 6088(a).  Parties opposing an application, here Neighbors, bear the

burden of persuasion under Criteria 5 and 8.  10 V.S.A. § 6088(b).  With these burdens in mind, the Court turns to each at-issue Criteria.

## I.  **Criterion 1**

Criterion 1 requires that an applicant show that their project "[w]ill not result in undue water or air pollution."  10 V.S.A. § 6086(a)(1).  In this matter, the question is whether noise, particulates, exhaust and chemicals will result in undue air pollution.  Criterion 1 does not specifically state what constitutes "undue" pollution.  Id.  The longstanding definition is "that which is more than necessary—exceeding what is appropriate or normal."  See In re N. E. Materials Grp., LLC, 2019 VT 55, ¶ 28, 210 Vt. 525 (quoting Re: John A. Russell Corp., No. 1R0849-EB, Findings of Fact, Conclusions of Law, and Order, slip op. at 43—44 (Vt. Envtl. Bd. Jul. 10, 2001)).

The determination of "whether 'undue' pollution will result from a proposed project is a highly fact-specific inquiry that depends on a wide variety of factors."  In re Diverging Diamond Interchange SW Permit, 2019 VT 57, ¶ 44, 210 Vt. 577 (citing N.E. Materials Grp., 2019 VT 55, ¶ 28)).  These factors include "the nature and amount of the pollution, the character of the surrounding area, whether the pollutant complies with certain standards or recommended levels, and whether effective measures will be taken to reduce the pollution."  N.E. Materials Grp., 2019 VT 55, ¶ 28 (quoting Re: Mclean Enters. Corp., No. 2S1147-1-EB, Findings of Fact, Conclusions of Law, and Order, slip op. at 41 (Vt. Envtl. Bd. Nov. 24, 2004)).  Compliance with applicable air quality standards is "an important, but nondispositive, factor in this inquiry," and we may consider "any factors relevant to a determination of whether a proposed project will cause undue pollution."  N. E. Materials Grp., 2019 VT 55, ¶ 28 (citation omitted); Diverging Diamond, 2019 VT 57, ¶ 45 (citation omitted).

The scope of the Court's analysis is limited to air pollution, including noise discussed below, resulting solely from construction of the Project as it is not disputed that the Project, a 32-unit residential development, will not have air pollution impacts once fully constructed. The focus of the evidence presented is on the construction, particularly the blasting and drilling aspects of the Project.

This Court and the former Environmental Board have each previously held that blasting associated with the construction of a residential subdivision will not result in undue air pollution. See In re BlackRock Act 250, No. 47-4-19 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Dec. 4, 2019); Re: Landmark Dev. Corp., No. 4C0667-EB, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. July 9, 1987). In both BlackRock and Landmark, the Court and Environmental Board looked to the applicant's blasting plan or guidelines to determine if applicant would conduct its blasting in a manner to mitigate impacts to neighboring environments and land uses and whether the blasting documents sought to follow industry standards to determine whether these aspects of construction would result in undue adverse air pollution relative to dust, particulates, and ground vibration.

Here, BlackRock has provided a blasting plan which will mitigate impacts from the blasting and drilling during the construction of the Project. Ex. M. BlackRock has employed Maine Drilling & Blasting as their blasting consultant. Maine Drilling & Blasting has experience conducting blasting and drilling for residential construction throughout Vermont and has recently worked on two projects within Chittenden County which required the blasting and drilling of rock on properties having surrounding development.

The construction process is limited to established hours. Construction, including drilling, may only occur from 7:00 AM to 6:00 PM Monday through Friday, and from 8:00 AM to 5:00 PM on Saturdays. No construction shall occur on Sundays or federal holidays. The blasting hours are 8:00 AM to 4:00 PM Monday through Friday, with no blasting to occur on Saturdays, Sundays, or federal holidays. Blasting may only occur for a three-month period, measured from the first blast to the last blast.[5] Only two blasts may occur per day.

BlackRock will conduct pre- and post-blast surveys for all structures within 750 feet of the blasting activity. This represents a 500-foot expansion from the industry standard survey area of 250 feet. These surveys require owner consent and are designed to understand the current status of a structure. If a homeowner believes the blasting damaged their home, the pre- and post- blasting surveys provide helpful insight. BlackRock is

---

[5] This condition was set by the City in the municipal process and may be extended upon review and approval by the City.

required to provide two weeks' notice prior to blasting. This notice is to all residents, institutional operators, and business establishments within 1,000 feet of the blasting, as well as the City and District Commission. BlackRock is required to monitor and report seismic and noise measurements from each blast. Ground vibration is not to exceed 2.0 inches per second from the blasting.

BlackRock is required to implement the Vermont Department of Environmental Conservation's Best Management Practices for Blasting to Avoid Environmental Contamination. BlackRock will employ additional measures to mitigate blasting and drilling impacts. These include the use of blast mats, which are placed over an area to be blasted to mitigate noise, dust, and particulate emissions. Additionally, BlackRock will employ a flexi rock system to mitigate dust and particulates. The flexi rock system runs water through the drill to introduce a fine mist at the drill's bit to limit dust creation. A vacuum then captures and removes additional dust to mitigate dust related impacts.

Additionally, BlackRock will employ industry standards and other practices to further mitigate off-site impacts. This includes leaving dirt on top of rocks to be drilled and ensuring all blasts are properly scoped to the needs of the Project within the context of the Property.

Pedestrians and traffic on the adjacent roadways will be briefly prohibited from moving past the Property during a blast as set forth in the Blasting Traffic Plan. Further, BlackRock will employ site security measures to limit those within the area of the Project.

Neighbors have expressed specific health and safety concern about flyrock and dust from blasting. Evidence presented at trial establishes that the industry standard mitigation of flyrock risk is a properly scoped blast; meaning the blast is scoped to the needs of the Project within the context of the Property and surrounding infrastructure. BlackRock will employ this industry standard and others described above, as well as those generally incorporated into the Blasting Plan. Neighbors' concerns regarding the risk of flyrock is therefore mitigated.

Neighbors expressed concerns related to chemicals that will be employed in the blasting and/or drilling process.[6] Neighbors' evidence is limited to the potential presence of specific chemicals noted on Material Safety Data Sheets (MSDS) within the Blasting Plan. See Ex. M at p. 50—136. No evidence is offered as how someone off-site might be exposed to the chemicals.[7] The MSDS are included in the Blasting Plan as there is a potential that each chemical may be used during the construction process. While it is not disputed that some chemicals potentially harmful to people or the environment could potentially be used during construction, there is no evidence that the chemicals will result in exposure to Neighbors or their members, there is no evidence of on- or off-site impacts, or evidence that environmental contamination may occur. Rather, the evidence shows that BlackRock is required to comply with the Agency of Natural Resources Best Management Practice to Avoid Environmental Contamination. Neighbors provide no evidence of how these practices are insufficient to protect from exposure or contamination related to these chemicals.

BlackRock has provided substantial evidence that it will mitigate off-site impacts from blasting and drilling during the construction of the Project, including blasting and drilling plans to show that the Project's construction will comply with industry standards and will mitigate off-site impacts. Blackrock will also comply with appropriate management practices with respect to non-noise air pollution such as dust, particulates, chemicals and ground vibration.[8] Conversely, Neighbors' evidence is limited to personal opinions about the blasting and drilling and overall fears that damage or injury may occur therefrom. While the Court is sympathetic to these concerns, Neighbors lack evidence to support their

---

[6] It is unclear whether Neighbors challenge the use of these chemicals as air pollution or some other type of pollution. This confusion is exacerbated by the fact that Neighbors post-trial briefing does not present any legal argument as to how the chemicals result in noncompliance with Criterion 1. Instead, concerns related to chemicals are only addressed in three discrete proposed factual findings. Even so, each of Neighbors only retained party status under Criterion 1 for air. To the extent that the alleged concern with these chemicals is non-air pollution related, such assertion is outside the scope of each of Neighbors' party status. To the extent that Neighbors raise concerns with the chemicals in the air pollution context, we address it here.

[7] To the extent that Neighbors at trial asserted that these products may be injurious to on-site individuals such as employees or agents of BlackRock working in the construction phase of the Project, they lack standing to raise such issue. See Baird v. City of Burlington, 2016 VT 6, ¶ 15, 201 Vt. 112.

[8] It is for this reason that, to the extent that Neighbors argue that BlackRock has not met its burden of production with respect to this aspect of Criterion 1, the Court concludes that BlackRock has met its burden.

opinions.  The Court therefore concludes that undue air pollution will not result from the Project.  Thus, we conclude that the Project confirms with Criterion 1 for dust, chemicals, ground vibrations, and particulates.

We now turn to the remaining aspect of Criterion 1 at issue in this appeal: noise. Noise from a project may rise to such an adverse level so as to constitute air pollution.  See Re: Bull's-Eye Sporting Ctr., No. 5W0743-EW, Findings of Fact, Conclusions of Law, and Order, slip op. at 14 (Vt. Envtl. Bd. Feb. 27, 1997).  The test to make such a determination is "whether the noise has 'impacts rising above annoyance and aggravation to cause adverse health effects such as hearing damage.'"  Id. (quoting Re: Talon Hill Gun Club Inc. & John Swininem, No. 9A0192-2-EB, Findings of Fact, Conclusions of Law, and Order, slip op. at 8 (Vt. Envtl. Bd. June 7, 1995).  Thus, conversely to the noise impacts addressed under Criterion 8, noise analysis under Criterion 1 focuses primarily on health and safety impacts. In re Goddard Coll., Nos. 175-12-11 Vtec, 173-12-12 Vtec, slip op. at 9 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014) (Walsh, J.) (citing Re: City of Montpelier & Ellery E. & Jennifer D. Packard, No. 5W0840-6-WFP, Findings of Fact, Conclusions of Law, and Order, slip op. at 21 (Vt. Envtl. Bd. May 22, 2000)).

This Court has adopted the former Environmental Board's process for analyzing noise impacts under Criterion 1.  See Goddard College, Nos. 175-12-11 Vtec,173-12-12 Vtec, slip op. at 10 (Jan. 6, 2014) (Walsh, J.); see also In re Burton Corp. Conditional Use/Act 250, 2024 VT 40, ¶ 36 (affirming this Court's conclusion that a project will comply with Criterion 1 relative to noise by applying the former Environmental Board's standard). Specifically, the former Environmental Board adopted the United States Environmental Protection Agency's (EPA) established adverse health impact standard of a noise level of 70 dBA, for 24 hours each day, 365 days a year, over a lifetime, as the level at which noise constitutes undie air pollution under Criterion 1.  See Re: Pike Indus., Inc., No. 5R1415-EB, Findings of Fact, Conclusions of Law, and Order, at 32 (Vt. Envtl. Bd. June 7, 2005); Re: Casella Waste Mgmt. & E.C. Crosby & Sons, Inc., No. 8B0301-7WFP, Findings of Fact, Conclusions of Law, and Order, at 29—30 (Vt. Envtl. Bd. May 16, 2000).   Additionally, the Environmental Board noted that "unsafe noise levels begin at around 90 decibels" and that

maximum noise levels considerably below that level do not constitute air pollution under Criterion 1. Re: Wildcat Constr. Co., No. 6F0283-1-EB, Findings of Fact, Conclusions of Law, and Order at 7, 10 (Vt. Envtl. Bd. Oct. 4, 1991) *aff'd* 160 Vt. 631 (1993).

The Project's noise is limited to the specific drilling, blasting and construction schedule. This schedule allows for 2 blasts per day for a period of three months. Drilling is limited to construction hours. Once the blasting and drilling aspect of the construction is completed, noise from Project is not at issue. This is because once construction is fully completed, the Project will be a residential neighborhood with no off-site noise impacts beyond that which is typical for such a neighborhood. This noise, having a limited duration within the construction phase of the Project, and with blasting only occurring for three months within that phase, will not exceed the applicable EPA standard for noise adopted under Criterion 1. There is no evidence that the Project's blasting and drilling will exceed the applicable EPA standard for noise adopted under Criterion 1.[9]

The Project's construction will result in noise that may be loud and apparent to Neighbors at times. Neighbors did testify as to noise levels during the drilling and blasting activities at some of their respective homes or homes of their members.[10] Again, Neighbors provided no evidence that the noise impacts of the Project, limited to its construction phase, will violate the applicable EPA standard for noise adopted under Criterion 1.[11] Functionally,

---

[9] Neighbors argue that BlackRock's failed to provide a noise study or assessment of construction noise and therefore BlackRock has failed to meet its burden of production on this issue. The Court disagrees. The applicable standard for noise under Criterion 1 is clear. Within the context of temporary construction noise, a noise study or assessment is not required to determine compliance in this case. To require applicants to provide such a costly expert report and study, particularly when the noise at issue is limited to the temporary construction phase of an otherwise not noisy project, would be to greatly increase the burden of production required of an applicant and increase the cost of pursuing a project. Thus, the Court will not impose such a burden on applicants, though nothing would prevent an applicant from providing a noise assessment to support its application.

[10] Further, Mr. Leas provided testimony related to calculations of potential noise levels based on various sources. Mr. Leas was not qualified as a noise expert. Mr. Leas' calculations lacked consideration of many variables that may impact noise levels such as topography and background noise such as existing construction and/or development. As such, we give this testimony little weight.

[11] The Court notes that Neighbors called Doctor Peter Bingham, a pediatric neurologist, to testify at trial as to the health impacts loud noises can have on people, particularly children. While the Court appreciates Dr. Bingham's testimony and understands from it that noise of a certain level can result in adverse health effects in certain circumstances, Dr. Bingham had not reviewed the application before the Court or the blasting plan. Thus, while his testimony provides some helpful background information, it lacks weight as to

Neighbors' challenge to the Project's noise is not based in the applicable Criterion 1 standard.

The Project noise is typical of residential construction. Blasting and drilling noise is mitigated. Neighbors effectively argue that, because they will be able to hear the blasting and drilling and will be disturbed by that noise, then the entire Project does not comply with Criterion 1. This is not the standard.

Act 250 Criterion 1 provides that noise impacts may not have an <u>undue and adverse</u> impact on air pollution. It does not provide that there may be no noise impacts. If the Court were to adopt the standard proffered by Neighbors, it would be highly unlikely that any proposed future project could comply with Criterion 1 relative to noise if it required blasting or drilling. This is because, in most portions of Vermont, someone could conceivably hear this construction noise and may be annoyed or disturbed by it.[12] Such noise impacts cannot be construed as undue and adverse air pollution. See <u>Rhodes v. Town of Georgia</u>, 166 Vt. 153, 157 (1997) (noting that long-standing principle that "statutes should not be construed to produce absurd or illogical consequences.") (citing <u>O'Brien v. Island Corp.</u>, 157 Vt. 135, 139 (1991).

For these reasons, we conclude that the Project, as conditioned, will not result in undue adverse air pollution.

The Project complies with Criterion 1.

---

understanding how the Project and its impacts do or do not comply with the applicable Act 250 Criterion 1 standards.

[12] It is for this same reason that we decline to adopt Neighbors' argument that unique medical conditions of those in the area surrounding the Project present grounds to conclude that the Project does not comply with Criterion 1. Nearly every fact witness provided by Neighbors testified that they had a medical condition that they believed would be exacerbated by the Project's construction. While the Court does not doubt the offered conditions or concerns, the existence of these medical conditions cannot present independent grounds to conclude that the Project does not comply with Criterion 1. The Court is guided to this conclusion by similar principles in Act 250 review, particularly under the Quechee test, discussed below. That analysis requires a consideration as to whether aesthetic impacts would shock and offend an average person. In that regard, this Court has concluded that the relevant analysis is not whether a project would shock or offend any specific person, but rather whether the impacts would do so from the perspective of a reasonable person. See <u>Goddard Coll.</u>, Nos. 175-12-11 Vtec, 173-12-12 Vtec, slip op. at 14 (Jan. 6, 2014) (Walsh, J.). The same must be true under Criterion 1. The analysis under Criterion 1 is whether noise will result in adverse health and safety impacts, generally. <u>Id</u>. at 9. The analysis under Criterion 1 is not whether noise will result in adverse health and safety impacts to any one individual.

19

## II. Criterion 5(A)

Pursuant to Criterion 5(A), a project must not "cause unreasonable congestion or unsafe conditions with respect to the use of the highways."  10 V.S.A. § 6086(a)(5)(A). [13] While BlackRock bears the burden of production on this Criterion, Neighbors bear the burden of persuasion.  See 10 V.S.A. § 6088(b); Eastview at Middlebury, No. 256-11-06 Vtec, slip op. at 4 (Vt. Envtl. Div. Feb. 15, 2008) (Durkin, J.).   A project may not be denied solely based on the lack of a positive finding under Criterion 5.  See 10 V.S.A. § 6087(b).  Rather, the Court may impose "reasonable conditions and requirements" to alleviate impacts under Criterion 5.  Id.; see also 10 V.S.A. § 6086(c).

The Project's homes will be accessible by a looped driveway, Zoey Circle, providing ingress and egress on Park Road.  Park Road is in turn accessible from Dorset Street.  There is a left turn only lane on the southbound side of Dorset Street to access Park Road.  Park Road has a posted speed limit of 25 miles per hour.  Park Road itself, and its intersection with Dorset Street, is not a high crash location.  Park Road is maintained by the City and was designed to meet City standards.  The first access point and curb cut for the Project is approximately 225 feet from the intersection of Park Road and Dorset Street.  The second access point and curb cut is approximately 400 feet from the first point.

From Dorset Street, Park Road generally slopes downwards to a point beyond the second proposed intersection of Zoey Circle and Park Road in the vicinity of a culvert and guardrails.  At this point, Park Road rises in elevation towards residences along Golf Course Road and Park Road.  The steepest portion of the road begins to the east of the second proposed access point, further away from Park Road's intersection with Dorset Street.  This section of the road is curved and has posed traffic incidents in winter weather.

---

[13] To the extent that BlackRock provides evidence of compliance with Criterion 5(B), which addresses "safe access and connections to adjacent lands and facilities and to existing and planned pedestrian, bicycle, and transit networks and services," the Court notes that the sole Question related to Criterion 5 before the Court is limited to Criterion 5(A) as it relates to traffic on the roadway networks in the vicinity of the Project.

BlackRock completed a traffic impact assessment of the Project completed by Richard Dickinson, P.E., formerly of Lamourex & Dickinson Consulting Engineers. Mr. Dickinson, P.E. is a traffic expert. See BlackRock Ex. K (the Traffic Report).[14] The Traffic Report assessed traffic impacts, including safety, from the Project in the area. The Traffic Report concludes that the new intersections for the Project on Park Road have more than the recommended 280 feet of sight distances. These sight distances also provide the safe stopping distance recommended for vehicles exceeding Park Road's posted speed limit by up to 10 miles per hour. The Traffic Report credibly concludes that the intersection between Dorset Street and Park Road will maintain acceptable levels of service with the Project. Further, that the additional traffic will not result in unsafe traffic conditions.

Neighbors maintain the burden of persuasion that the Project will not comply with Criterion 5. Neighbors and their witnesses, who largely use Park Road for access to their homes and Dorset Street for general travel, testified that Park Road can pose hazardous conditions at times. Specifically, when there is snow or ice. This is exacerbated by instances of windswept snow.

Neighbors propose that traffic impacts and safety concerns would be mitigated if the Project were reduced to only 7 homes on the Property, which could result in only one new access point for the Project on Park Road.[15] This would represent a complete redesign of the entire Project. This Court declines to adopt measures that would require the complete redesign of a project before the Court as reasonable mitigation. See In re Zaremba CU – Jericho, No. 101-7-13 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Nov. 7, 2014) (Walsh, J.)[16]

Thus, Neighbors do not offer reasonable mitigation to address their traffic concerns from the Project. Additionally, Neighbors fail to meet their burden of persuasion as they have not provided a traffic report or study, or specific evidence showing that the Project will

---

[14] To the extent that Neighbors argue that BlackRock has not met its burden of production despite undertaking and providing the Traffic Report and providing Mr. Dickinson's testimony as an expert traffic engineer, the Court disagrees and concludes that BlackRock has met its burden of production on this Criterion.

[15] To the extent that Neighbors argue that the Project should be denied due to alleged non-compliance with Criterion 5, again, a project cannot be denied under Criterion 5 alone. See 10 V.S.A. § 6087(b).

[16] While the Zaremba case addressed municipal zoning, the Court concludes that the principle of what constitutes reasonable mitigation remains relevant in the Act 250 context.

result in noncompliance with Criterion 5. Finally, Neighbors do not provide contradictory evidence and did not elicit testimony on cross-examination of Mr. Dickinson challenging the conclusions of the Traffic Report.

Thus, the Court concludes that the Project complies with Criterion 5 as proposed.

## III.     Criterion 8

A proposed project may "not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. §6086(a)(8). Applicant, here BlackRock, must provide evidence sufficient to enable the Court to find that the project will not have such impacts and, if applicant so provides, the burden of proving that a project does not conform to Criterion 8 rests upon project opponents, here Neighbors. See 10 V.S.A. § 6088(b); Rte. 103 Quarry, No. 105-10-05 Vtec, slip op. at 8 (Nov. 22, 2006) (Durkin, J.).

The cornerstone of the Court's analysis under Criterion 8 is the question: "[w]ill the proposed project be in harmony with its surroundings –will it 'fit' the context within which it will be located?" Re: Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985), *aff'd* 154 Vt. 543 (1990). It must be noted, however, that Criterion 8 is not a guaranty that aesthetics in an area will never change, but instead ensures that the change will be reasonable. Re: Times & Seasons, LLC, No. 3W0839-2-EB (Altered) Findings of Fact, Conclusions of Law, and Order, at 39 (Vt. Envtl. Bd. Nov. 4, 2005); Re: John J. Flynn Estate, No. 4C0790-2-EB, Findings of Fact, Conclusions of Law, and Order, at 25 (Vt. Envtl. Bd. May 4, 2004).

When analyzing a project under Criterion 8 we follow the two-part test established by the former Environmental Board known as the "Quechee test." Quechee Lakes, Nos. 3W0411-EB, 3W0439-EB, at 17 (quotations omitted); In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567 (approving use of the Quechee test). First, the Court examines whether a proposed project may cause an adverse impact on the character of the area. Quechee Lakes, Nos. 3W0411-EB, 3W0439-EB, at 19. If so, the Court moves to the second prong of the analysis, which requires a determination of whether the impact will be "undue." Id.

When determining whether a project will have an adverse impact, the Court looks at how the project fits within the context of its area in terms of size, scale, nature of use and various off-site impacts, here with respect to aesthetics and noise.  Id.  If the project fits within the aesthetic context, it will not have an "adverse" aesthetic impact and will comply with Criterion 8.

If the Court finds that a project does not fit within its context, and therefore has an "adverse" aesthetic impact on the area, a project will still comply with Criterion 8 unless the adverse aesthetic impact is found to be "undue."  An impact is "undue" if:

> (1) it violates a clear, written community standards intended to preserve aesthetics or scenic, natural beauty of the area; (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 17, 199 Vt. 19.

The Court notes that, in understanding the Project's compliance with Criterion 8 in all accounts, it is important to understand what Criterion 8 does and does not ensure.  This was eloquently put by the former Environmental Board:

> Criterion #8 was not intended to prevent all change to the landscape of Vermont or to guarantee that a view that a person sees from his or her property will remain the same.  Change must and will come, and Criterion #8 will not be an impediment.  Criterion #8 was intended to ensure that as development does occur, reasonable consideration will be given to visual impacts on neighboring landowners, the local community, and on the special scenic resources of Vermont.

Re: Okemo Mountain, Inc., No. 2S0351-8-EB, Findings of Fact, Conclusions of Law, and Order at 9 (Vt. Envtl. Bd. Dec. 18, 1986) (emphasis added).  This stated purpose of Criterion 8 has been reaffirmed by the Environmental Board and this Court numerous times.  See e.g., In re Rinkers, Inc., No. 302-12-08 Vtec, slip op. at 11—12 (Vt. Envtl. Ct. May 17, 2010) (citations omitted) *aff'd* by 2011 VT 78; Re: Times & Seasons, LLC, No. 3W0839-2-EB (Altered), Findings of Fact, Conclusions of Law, and Order (Nov. 4, 2005) *aff'd in part, rev'd*

*in part* by 2008 VT 7; <u>Re: Main St. Landing Co. & City of Burlington</u>, No. 4C1068-EB, Findings of Fact, Conclusions of Law, and Order at 17—18 (Vt. Envtl. Bd. Nov. 20, 2001).

Neighbors have raised concerns regarding general Project aesthetics. Additionally, Neighbors raise concerns of noise, but this impact is limited to noise during construction as the Project does not propose noise impacts after construction. We address each issue separately.

**a. Visual Aesthetics**

    i. <u>Adverse Aesthetic Impact</u>

Presently the Property is a vacant field. When complete, the Project will consist of single and two-story residences, including townhomes and standalone homes. The Property is viewable from Dorset Street and Park Road as well as the recreational path running along Dorset Street. In connection with the Project's construction, BlackRock has provided a landscaping plan from TG Boyle Associates (the Landscaping Plan). The Landscaping Plan proposes to retain existing trees and provide plantings throughout the Project, including buffers along the portion of the Project adjacent to the recreational path and a split rail delineation fence surrounding the Property. While the Project may be visible from the recreational path at the initial time of the plantings, over time the goal of the Landscaping Plan is for these plantings to screen the Project in this area. All plantings are to be permanent.

The Project is abutted on the west by Dorset Street, across Dorset Street is the residential development, the Villas at Water Tower Hill. To the south the Project is abutted by Park Road, then a field, followed by additional development. To the north and east, the Project is adjacent to the Wheeler Nature Park. Additional significant residential development is located on Park Road and Golf Course Road, with more than 88 units in that neighborhood. Witnesses called to testify by Neighbors live in other residential developments in the area, including to the north of the Project on Dorset Street and around Swift Street as well as southeasterly of the Project. Project density is consistent with, or less than, the density of other developments in the area.

24

Neighbors, in their briefing, wholly ignore this residential context, but instead focus on the fact that the Project is adjacent to, and prior to 2017 was a part of, the Wheeler Nature Park.[17] Such a focus fails to address the full scope of the surrounding area, which contains significant residential development.

The Project's residences will be contemporary in style, though various aspects of their design may vary. Exterior painting is consistent with residences in the surrounding area.

Neighbors do not dispute the individual aesthetics of the residences. Instead, to the extent that they dispute the Project's specific aesthetics, they do so as it relates to the density of the Project. As set forth above, however, the Project's density is consistent with surrounding developments.

Thus, the area surrounding the Project consists of significant residential development and, generally, the nature of the Project's use as a residential development fits within the context of the area.

Neighbors argue that the Project does not comply with Criterion 8 relative to scenic views of the Green Mountains from Dorset Street and the recreational path. Neighbors' witnesses testified that they were concerned about impacts to views of the Green Mountains from their respective houses, while driving on nearby roadways, and while on the recreational paths. The Court understands that Neighbors argue first that the Project should not be sited at the Property at all or, alternatively, the Project should contain fewer homes each limited to a single story.

It is not disputed that the Project will impact the existing view of the Green Mountains, particularly from the recreational path and Dorset Street. Because the Project will reduce or limit this view, we conclude that the Project will have an adverse aesthetic impact in this regard.

Thus, we next consider whether this adverse impact is undue.

_____

[17] To the extent that Neighbors argue that BlackRock and, presumably, the Court are not permitted to take into consideration the surrounding residential development based on previous assertions by BlackRock that this development is a discrete project as it relates to other JAM Golf developments, such an assertion is contrary to Criterion 8 and would necessitate this Court to turn a blind eye to the existing development context of a proposed project.

25

ii. Undue Adverse Aesthetic Impact

### 1. *Clear Written Community Standard*

When determining if there is a clear, written community standard that would apply to a project, the Court generally looks to town plans.  McLean Enters. Corp, No. 2S1147-1-EB, Findings of Fac, Conclusions of Law, and order at 55 (Vt. Envtl. Bd. Nov. 24, 2004).  A clear written community standard must be "intended to preserve the aesthetics or scenic beauty of the area" wherein a project is located.  Re: Davis, No. 2S1129-EB, Findings of Fact, Conclusions of Law, and Order at 9 (Vt. Envtl. Bd. Dec. 15, 2004).

First, we determine which iteration of the City Plan applies, the 2016 City Plan or the 2024 City Plan.  It is a long-established principle in Act 250 that "[municipal plan] amendments which occur after the application date and which favor an applicant . . . govern . . . [when the applicant] has requested that [their p]roject be governed by the" the subsequent municipal plan.[18]  Re: Peter S. Tsimortos, No. 2W1127-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Apr. 13, 2004) (citing Re: Fred & Laura Viens, No. 5W1410-EB, Memorandum of Decision at 4—5 (Vt. Envtl. Bd. Sept. 3, 2003); Re: Juster Dev. Corp., No. 1R0048-8-EB, Findings of Fact, Conclusions of Law, and Order at 33 (Vt. Envtl. Bd. Dec. 19, 1988)). This approach is an exception to the vested rights doctrine. This Court adopted the Environmental Board's rational on this issue more than 15 years ago. See Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 24—25 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.) *aff'd* 2008 VT 98.[19]

---

[18] Neighbors have argued that there is an additional prong of this analysis that this Court allegedly adopted in Eastview, discussed herein.  Specifically, that the amended municipal plan that an applicant seeks to take advantage of must specifically note that the plan encourages or endorses the project at issue.  They base this argument in dicta of Eastview, which notes that the amended municipal plans endorsed the at-issue project.  Eastview at Middlebury, No. 256-11-06 Vtec, slip op. at 24—25 (Feb. 15, 2008).  Eastview does not stand for the principal that an amended municipal plan must specifically address the at-issue project, it just notes that in that case it did. To follow Neighbors' interpretation of Eastview would be untenable because most municipal plans do not address specific projects.

Further, Neighbors argue that Eastview stands for the proposition that this Court has discretion to decline to allow an Applicant to follow the well-settled principle that Applicant may avail itself to an amended plan that favors it.  There is no discretion provided in Eastview and such proffered discretion would fundamentally undermine the purpose of the principle.

[19] The Court notes that these cases addressed the applicable municipal plan in the Criterion 10 context.  We conclude that this same principal should apply in the Criterion 8 context as well.  We note that prior Environmental Board decisions have stated that the community standard effective on the date an

Neighbors present two reasons why this Court should decline to apply the 2024 City Plan.  First, they argue that it would be unfair to them.  Second, they functionally challenge the 2024 City Plan itself.

Neighbors base their fairness argument in this Court's procedural rules.  Pursuant to V.R.E.C.P. 1, this Court's procedural rules "shall be construed and administered to ensure summary and expedited proceedings consistent with a full and fair determination in every matter coming before the court."  The vested rights doctrine, and its exceptions, are not procedural rules of this Court, but are principles of Act 250 practice.  Thus, V.R.E.C.P. 1 is not directly relevant to this Court's ability to apply or decline to apply it.

To the extent that Rule 1 provides analogous analysis, however, we conclude that it is not unfair to apply the 2024 City Plan.  First, it has been established by this Court and the Environmental Board that an applicant may so avail themselves to amended plans it believes are more favorable to it.  The fact that Neighbors were not aware of this principle does not make it unfair to apply.

Further, to decline to allow BlackRock to use the 2024 City Plan would be inefficient.  To illustrate, if the Court were to decline to apply the 2024 City Plan, nothing would prevent BlackRock from withdrawing its current application, initially filed in September 2021, and refile its application so that it would be subject to the 2024 City Plan.[20]  It would then need

application is filed controls.  See Re: Burlington Broadcasters Inc. d/b/a WIZN, et al, No. 4C1004R-EB, Memorandum of Decision at 10—11 (Vt. Envtl. Bd. Nov. 25, 2003); Re: Northshore Dev., Inc., #4C0626-5-EB (Vt. Envtl. Bd. Dec. 29, 1988).  Both Burlington Broadcasters and Northshore, however, addressed circumstances in which an applicant sought to apply a previous iteration of community standards that were in effect prior to the date of the Act 250 application, but at the time that the applicant sought a zoning permit for the at-issue project.  Project opponents sought to impose the standards in effect at the time of the Act 250 permit application. This is not the situation before the Court in which applicant is seeking the Court to apply a subsequent City Plan that benefits it and project opponents are asking the Court to apply a since-expired municipal plan.  The Court notes this distinction and gap in the law because the Court is unaware of a case, either before this Court or the former Environmental Board that addressed interim changes in the Criterion 8 context of community standards.  The Court believes that the rationale adopted in Eastview must similarly apply in the Criterion 8 context.  We note, however, that this issue has not been fully developed by the parties and, in the interest of completeness, the Court looks to both the 2024 City Plan and 2016 City Plan for community standards.  In any event, because the Court concludes that there are no clear, written community standards in the 2016 City Plan that would be applicable to the Project in this Criterion 8 context, the issue is not material to the pending decision.

[20] The Court understands that BlackRock argues that it is also in compliance with the 2016 City Plan but presents this example to demonstrating its reasoning in declining to adopt Neighbors' assertion.

to fully restart its application, duplicating all its resources.  What's more, the District Commission would be forced to duplicate its hearing process.  Should there be an appeal, the same would result before this Court.  This inefficient approach is the fundamental policy of the exception to the vested rights doctrine.  The resulting inefficient process would be inconsistent with Rule 1, which request that we administer our rules "to ensure summary and expedited proceedings . . ."  V.R.E.C.P. 1.  We therefore conclude that we review the Project subject to the 2024 City Plan, as Blackrock has elected.

Neighbors also argue that this Court cannot or should not apply the 2024 City Plan in this proceeding due to challenges to the plan itself and the 2024 City Plan's compliance with the enabling statue.  This issue is outside the scope of this Court's jurisdiction.  This Court is one of limited jurisdiction.  4 V.S.A. § 34.  The Court is unaware of any provision of law that would afford it the power to review a municipal plan and determine whether all or part of it is ineffective or invalid.  Further, it is undisputed that the City has adopted the 2024 City Plan.  Thus, the Court declines to address Neighbors' challenges in this regard as outside the scope of this Court's jurisdiction.

We conclude that the 2024 City Plan applies to Blackrock's application.[21]

Neighbors point to no provision of the 2024 City Plan that would apply to the Project.  To the extent that Neighbors state that the plan notes that "[t]he City intends to maintain Wheeler [Nature Park] as a natural area," Ex. HH at 91, the Property is not within the Wheeler Nature Park or a part of the park.  Thus, this provision is inapplicable to the Project and the Court need not determine if it is a clear written community standard.

We therefore turn to remaining documents that Neighbors assert set forth clear, written community standards in the Criterion 8 context.

---

[21] For completeness, this Court has reviewed the provision of the 2016 City Plan cited in Neighbors' post-trial brief.  The Court finds no provisions therein that constitute clear, written community standards applicable to the Project under Criterion 8 for aesthetics.  This includes 2016 City Plan page 2-31, 2-103, 3-30, 3-31, 3-35.  Additionally, a majority of this language and maps Neighbors cite as creating clear, written community standards are outdated.  The 2016 City Plan was adopted when the Property was a part of Wheeler Nature Park.  Maps therein reflect that configuration.  After the 2016 City Plan was adopted but prior to the adoption of the 2024 City Plan, the status of the Property changed.  It is no longer City-owned land or a public park and it is instead a private lot.  In this specific context, the language and mapping as it relates to the Property being within the Wheeler Nature Park and City-owned land is no longer relevant to the Property.

First, Neighbors point to the 2018 Chittenden County ECOS Plan (previously defined as the 2018 ECOS Plan). The Project is within the rural planning area of the 2018 ECOS Plan. The ECOS Plan is accompanied by a Supplement 3 (previously defined as 2018 Supplement 3 to 2018 ECOS Plan. It specifically states that the 2018 ECOS Plan is "a strategic plan that it intended to provide **general advisory guidance** and intentionally chose to use 'should' rather than shall, in the Plan's goal statements." Ex. 8 at 2 (emphasis in original). Thus, by its own terms of purpose, the 2018 ECOS Plan is not a clear, written community standard, and the Court will not apply it as such.

Next, Neighbors argue that a 2014 Open Space Report is relevant to this analysis. The 2014 Open Space Report states that it "presents the work and recommendations of the South Burlington Open Space Committee under its charge from the City Council to identify, document and recommend strategies to conserve the city's most valuable and important spaces." Ex. 20 at 4. It further states that "[t]he information and recommendations included in this report have been developed for <u>consideration</u> by the Planning Commission and City Council . . . Additional public input and review will be needed prior to implementing report recommendations." <u>Id</u>. On its face, the 2014 Open Space Report is a report of recommendations for City officials to consider when adopting future land use planning regulations and is not in itself a document creating standards that apply to development in the City. The 2016 City Plan refers to the 2014 Open Space Report. At no point, however, does it adopt or incorporate it in full. The same is true for the 2024 City Plan. The Court will not review any provisions of the 2014 Open Space Report that are not directly incorporated or adopted by the relevant municipal plan, here the 2024 City Plan. Thus, the Court concludes that the 2014 Open Space Report does not qualify as a clear, written community standard under Criterion 8 in the context of this appeal.

Next, Neighbors look to the 2004 Arrowwood Assessment. The 2004 Arrowwood Assessment is not incorporated into the 2024 City Plan. Thus, the Court is unclear as to how it would be effective in this context as a community standard. Further, the 2004 Arrowwood Assessment states that its objective is to "make management recommendations . . .." Ex. 3 at 5. It then goes on to provide such "recommendations." <u>Id</u>. Black's Law Dictionary

29

defines "recommendation" as "1. A specific piece of advice about what to do, esp. when given officially. 2. A suggestion that someone should choose a particular thing or person that one thinks particularly good or meritorious."  Black's Law Dictionary (12th ed. 2024) ("Recommendation").  Absent any clear evidence that these recommendations have been fully adopted by the City as standards to be applied to development in the 2024 City Plan or through some other means, the Court concludes that the 2004 Arrowwood Assessment is not a clear, written community standard in the context of this appeal.

Finally, Neighbors assert that the Wheeler Nature Park Management Plan presents standards applicable in this context.  This assertion, however, is predicated on the assertion that the Project is within the Wheeler Nature Park and therefore subject to its terms.  This management plan was written in May 2015 at which point the Property was within the park.  Since 2017, however, the Property has not been a part of the Wheeler Nature Park and has instead been a privately owned lot.  The Wheeler Nature Park Management Plan is inapplicable to the Property and cannot present clear, written community standards in the context of the pending application.  This is true even if the Wheeler Nature Park Management Plan includes outdated mapping indicating that the Property is within the park.

We conclude that the Project does not violate a clear, written community standard with respect to aesthetics.

### 2.  Shocking to the Average Person

The Court's analysis in this regard is not whether the Neighbors or their members will be shocked by the Project, but whether the average person would be.  See Goddard College, Nos. 175-12-11 Vtec, 173-12-12 Vtec, slip op. at 14 (Jan. 6, 2014) (Walsh, J.).  The relevant inquiry "includes whether the [p]roject would be so out of character with its surroundings or so significantly diminish the scenic qualities of the areas to be offensive or shocking to the average person."  Re: Times & Seasons, No. 3W0839-2-EB, at 49 (Nov. 4, 2005).

Neighbors argue that the Project will be shocking to the average person because it will diminish views along the recreational path and will otherwise interfere with the use of Wheeler Nature Park.  The Court disagrees.

First, the Property is not a part of Wheeler Nature Park and has not been since 2017. Prior to JAM Golf's ownership, the Property was a part of the park. To the extent that Neighbors argue that they have any right of access to use the Property like they do Wheeler Nature Park, this Court is without jurisdiction to adjudicate private property rights. Blackrock has provided a threshold showing that the Property is privately held. Thus, to the extent that this Court must consider this issue as it relates to the pending Act 250 permit application, it is undisputed that the Property is private property that adjoins a public park. Neighbors point to no basis in law that would afford them the right to use the Property like a public park such that this application must be denied.

Neighbors offer that the Project adversely impacts views of the Green Mountains from some of their properties, from Dorset Street and the recreational path(s). We disagree that the impact on these views is shocking to the average person. At trial, Neighbors offered witnesses who live in residential developments that abut or are near the Wheeler Nature Park or other public parks, such as Veterans Memorial Field. These witnesses wish to see the Property remain an open lot such that they can retain the view over and/or of the Property, particularly when recreating on the recreational path(s). This desire does not amount to the Project itself being offensive or shocking to the average person. This is particularly true within the context of the larger residential developments in the vicinity of the Project in which many of these witnesses live.

Again, there is significant residential development around the Property along Dorset Street and Park Street. The Project is a comparably sized residential development, consistent with these existing developments. Many of these developments sit between Dorset Street and the Green Mountains to the east and impact views of the mountains. Again, Neighbors ignore the existing residential development in the area. This significant residential development, however, is a defining characteristic of this area. Thus, while the Project will impact the view in this portion of the recreational path(s) and Dorset Street, the impact is consistent with the uses in the area, and therefore consistent with the character of the Project's surroundings and the scenic qualities of the area. See Re: Times & Seasons,

31

No. 3W0839-2-EB, at 49 (Nov. 4, 2005).[22]  Thus, the Project is not shocking to the average person.  This is consistent with the purpose of Criterion 8, which does not guarantee views.  See Re: Okemo Mountain, Inc., No. 2S0351-8-EB, at 9 (Dec. 18, 1986).  Instead, it provides "reasonable consideration" to impacts on neighboring landowners and the community.  Id.

3.  *Reasonable Mitigation*

Neighbors provide no reasonable mitigation that BlackRock could undertake to lessen Project impacts.  First, Neighbors assert that, functionally, no mitigation is possible, and the Project should be built elsewhere.  Relocation of a project to an off-parcel location is not reasonable mitigation under Criterion 8.  See In re Vt. Elec. Power Co., No. 7C0565-EB, Findings of Fact, Conclusions of Law, and Order at 4—5 (Vt. Envtl. Bd. Dec. 12, 1984).

At trial, Neighbors argued that if the Project were reduced from 32 units to 7 units, and other scoping of the Project were reduced including only single-story houses, the Project could be reasonably mitigated.  This is not reasonable mitigation.  It is a completely different project than the one before the Court.   See id.; see also Zaremba CU – Jericho, No. 101-7-13 Vtec, slip op. at 14 (Nov. 7, 2014).

Blackrock's Landscaping Plan reduces the Project's visual impacts as viewed from the recreational path(s) and Dorset Street.  The Landscaping Plan proposes reasonable visual mitigation of the Project.  While the Court recognizes that the Landscaping Plan does not address Neighbors' overarching concern about diminished views of the Green Mountains resulting from the Project.  As set forth above, however, Criterion 8 does not guarantee views.  The mitigation proposed through the Landscaping Plan and the general aesthetic design of the Project, in light of the purpose of Criterion 8, is reasonable.

Having failed to identify any reasonable mitigation that BlackRock has not undertaken, we conclude that the Project complies with this prong of the Quechee test.

---

[22] It is for the same reason that we conclude that the Project will not interfere with the use of Wheeler Nature Park.  The area surrounding Wheeler Nature Park is defined by residential development such as the Project.  Further, there are residential developments directly abutting Wheeler Nature Park, particularly on Park Road to the east of the Project.  Neighbors provide no cohesive argument as to why those residences are not shocking or offensive to the average person, but the Project somehow would be despite being of a lesser density than those residences.

We conclude that while the Project will have an adverse impact on aesthetics relative to views, that impact will not be undue.  Thus, the Project complies with Criterion 8.

## II.    Noise

### a.  Adverse Aesthetic Impact

Vermont does not have a quantitative noise standard. See, e.g., In re Chaves, 2014 VT 5, ¶ 31 n. 4. We use a benchmark known as the Barre Granite standard for measuring whether noise is adverse under the Quechee test: 70 decibels (dBA) (Lmax) at the property line of a project and 55 dBA (Lmax) outside an area of frequent human use.[23] Re: Barre Granite Quarries, LLC, No. 7C1079 (Revised)-EB, Findings of Fact, Conclusions of Law, and Order, at 80 (Vt. Envtl. Bd. Dec. 8, 2000); see also Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 80. Even with the benchmark, the question of whether noise is "adverse" ultimately depends on whether the noise suits the existing soundscape, considering the nature and volume of existing noise and the qualitative character of the noise that will be added. Lathrop, 2015 VT 49, ¶ 81; McLean Enters. Corp., No. 2S1147-1-EB, at 53–54 (Nov. 24, 2004).

The Barre Granite standard, however, must be applied flexibly.  Lathrop, 2015 VT 49, ¶¶ 81—82; Chaves, 2014 VT 5, ¶ 33; In re McCullough Crushing, Inc., No. 179-10-10 Vtec, slip op. at 21—22 (Vt. Super. Ct. Envtl. Div. Feb. 16, 2017) (Walsh, J.).  The Court notes that it believes this is the first instance of it being confronted with the application of the Barre Granite standard to temporary construction noise.  This is important because the Barre Granite standard and subsequent cases relying thereon addressed instances wherein noise was a fundamental component of the operation of the project throughout the entire project's life.  The flexible application of the standard was within the context of the existing soundscape and how this long-term noise would fit into the area.  See e.g. Northeast Materials Grp., No. 75-6-17 Vtec (June 20, 2018) (addressing an expansion of an existing quarrying operation to include rock crushing and trucking); In re Big Rock Gravel Act 250, No. 45-3-12 Vtec (Vt. Super. Ct. Envtl. Div. Nov. 28, 2012) (Walsh, J.) (addressing an application

---

[23] In Northeast Materials Grp., this Court noted that, despite earlier application in the "undue" prong of the Quechee test, the Barre Granite was more recently applied in the "adverse" prong.  Northeast Materials Grp., LLC, et al., No. 75-6-17 Vtec, slip op. at n. 5 (Vt. Super. Ct. Envtl. Div. June 20, 2018) aff'd 2019 VT 55.  The Court concludes that this is its proper place within the analysis.

related to the operation of an existing gravel pit); In re Katzenbach Act 250 Permit, No. 79-7-19 Vtec (Vt. Super. Ct. Envtl. Div. Apr. 16, 2021) (Walsh, J.) (same).

The case before the Court is fundamentally different from those cases and projects. The noise at issue here is temporally limited within the life of the Project to its construction phase only. After construction, the Project will be used as a residential neighborhood, with the minimal off-site noise impacts associated with such a use, like children playing and summer grass cutting. No party provided a noise analysis conducted by a sound engineer. In this context, however, a noise study is not necessary to determine compliance with the Barre Granite standard. [24] BlackRock's evidence shows that, during blasting, a maximum sound level of 133 dB could occur at the nearest residence. This is consistent with the condition imposed by the District Commission below. Neighbor James Leas, though not a noise expert, calculated noise at Neighbor Jeanne Zagursky's home at 81 dBA during construction. While this evidence is not in the form of a noise analysis that is typically used to determine compliance with the Barre Granite standard, this undisputed evidence shows that the Project will, for the limited period of construction and particularly during the 3-month blasting period, not comply with the standard.

It is undisputed that the Project will result in off-site noise impacts from drilling and blasting during construction. Neighbors testified that similar activities from prior construction projects caused noise disturbing to them.[25] As such, we conclude that temporary construction noise is adverse.

---

[24] This would not preclude a party from seeking to show that their project complied with the Barre Granite standard and, therefore, was not adverse under the Quechee test through noise analysis. It is for this reason that the Court disagrees with BlackRock's contention that the Barre Granite standard, and subsequently the Quechee test must be applied so flexibly as to be functionally non-existent in the temporary construction context. Further, prior Environmental Board cases show that temporary construction noise is reviewable under Criterion 8. See Re: John & Joyce Belter, No. 4C0643-6R-EB, Findings of Fact, Conclusions of Law, and Order, at 14—15 (Vt. Envtl. Bd. May 28, 1991).

[25] The Court notes that the evidence presented shows that test drilling was conducted on the Project site of approximately 160 test holes. BlackRock received no complaints relative to that test drilling despite Neighbors testifying that they owned and/or occupied their respective properties during the period of the test drilling.

34

b. Undue Adverse Aesthetic Impact

i. *Clear, Written Community Standard*

Neighbors point to two City documents to argue that the Project violates a clear written community standard for noise: the City Nuisance Ordinance and the LDRs.[26] We address each in turn.

The City Nuisance Ordinance states that "[i]t shall be unlawful for any person to make or cause to be made and loud or unreasonable noise." Ex. 47 at 3. It states that noise is "unreasonable when it disturbs, injures or endangers the peace or health of a person or when it endangers the health, safety or welfare of the community." Id. The Nuisance Ordinance, however, exempts noises from specific sources. Specifically, "[e]vents and activities conducted by or permitted by the City." Id. at 4. The Project has a municipal zoning permit which specifically authorizes the blasting and drilling at issue in this Act 250 appeal. Ex. EE. Neighbors argue that this provision, however, is inapplicable to the Project because the clause goes on to address events or activities such as entertainment permits, parade permits or parks special use permits must abide by the terms of such permissions. Id. The Court disagrees that this exception is limited to these specific permits. That conclusion means that other actions permitted by the City, most namely, construction and development generally, would be nuisances. It is illogical that the City could authorize and permit a use or activity which would then be considered a nuisance by its own Nuisance Ordinance. Thus, the Court will not interpret the Nuisance Ordinance as such. See In re Stowe Club Highlands, 164 Vt. 272, 280 (1995) (refusing to interpret regulation such that it leads to irrational results). We conclude that the exemption applies, and therefore, the Project does not violate the Nuisance Ordinance.

---

[26] Neighbors have also asserted provisions of the 2016 City Plan may be relevant to this analysis. For the reasons set forth above, however, the 2016 City Plan does not control the pending application. The Court has, however, reviewed the cited provision of the 2016 City Plan that the Neighbors cite to as relevant to Criterion 8 noise within their post-trial briefing. We conclude that it does not set forth a clear, written community standard. See Ex. W at 2-52. To the extent that Neighbors assert that any provisions cited in the 2016 City Plan relative to aesthetics are similarly relevant to noise under Criterion 8, for the same reasons as set forth above, we conclude that they do not set forth clear, written community standards.

35

Next, Neighbors turn to the LDR performance standards set forth in LDR § 3.13. First, section 3.13B states that "the use of land in any manner so as to cause hazardous or objectionable conditions to exist or to in any way endanger users of the site or the surrounding area" is prohibited." This would include noise. The Project has a zoning permit that was not appealed concluding that § 3.13 is inapplicable, Ex. EE at 25. Even if we were to conclude that § 3.13B and Appendix A were applicable contrary to the City's conclusion, the Project has incorporated significant mitigation measures to protect against hazardous conditions. This includes construction hours and blasting limitations imposed by the City itself.

The same is true for the performance standards set forth in LDR Appendix A. Appendix A declares "any noise which is deemed objectionable because of volume and is not otherwise controlled" is "declared to be loud and disturbing." LDR Appendix A, A.3. As set forth above, however, the noise at issue in this Project is significantly controlled by conditions set forth both by the application itself, the City, and by the District Commission. Appendix A addresses noise of a volume that is objectionable and is not otherwise controlled. Additionally, once the Project construction is complete, there will be no loud or disturbing noise associated with its residential use. Thus, the Court concludes that Appendix A is not relevant to our analysis as the noise at issue is controlled and mitigated. To the extent, however, that it is relevant to our analysis, the Court concludes that to adopt Neighbors interpretation of both LDR § 3.13 and Appendix A and conclude that these provisions set forth clear, written community standards that this Project's mitigated temporary construction noise violates would amount to a de facto prohibition on construction noise in the City under Criterion 8. This is an unreasonable interpretation of these provisions of the LDR.

Thus, we conclude that the Project does not violate a clear, written community standard with respect to noise.

*ii. Shocking to the Average Person*

We conclude that the Project's noise will not be shocking or offensive to the average person. Neighbors are concerned with noise from the Project in area residences, along the

36

recreational paths in the area, and within the adjacent Wheeler Nature Park. While the Court understands these concerns, the construction noise is limited to the construction phase of the Project. The blasting is further limited to 2 blasts a day for the 3-month period. While this construction period will be noisy, after its completion, the Project will be a residential neighborhood with limited noise impacts. This is fundamentally different from the Rivers case cited by Neighbors in which the project at issue was a rock quarry and crushing facility in which the at-issue noise was a fundamental aspect of the project throughout its lifetime. See In re Rivers Dev., Nos. 7-1-05, 68-3-07 Vtec (Vt. Envtl. Div. Mar. 25, 2010) (Durkin, J.). The two project's noise impacts are not properly comparable.

The Court is further guided to this conclusion by the mitigation proposed to limit noise impacts. This includes construction hours, blasting time limitations, and safety stops all limiting noise impacts to those in the area. Thus, we conclude that the Project's noise impacts, which are mitigated through construction hours and practices set forth herein, and with blasting limited to a 3-month period, are not offensive or shocking to the average person.

### iii.   Reasonable Mitigation

As set forth above with respect to aesthetics under Criterion 8, Neighbors point to no reasonable noise mitigation available to BlackRock which it has not undertaken. Neighbors' proffered mitigation include reducing the number of units from 32 to 7, eliminate all blasting and drilling, eliminate the need for the additional connection of Zoey Circle to Park Road, and only build one-story homes away from the recreational path. None of this proposed mitigation constitutes reasonable mitigation in the Criterion 8 context. Instead, the proposed mitigation amounts to a considerable redesign of the current Project. Further, BlackRock has provided mitigation for noise in the form of a limited 3 month period for blasting, limited 2 blasts per day, and limited construction hours and days. The Court concludes such mitigation is reasonable in this context. Thus, the Court concludes that BlackRock complies with this prong of the Quechee test.

For these reasons, we conclude that the Project complies with Criterion 8 for noise.

37

## IV. Criterion 10

Act 250 Criterion 10 requires that developments be "in conformance with a duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). For a town or regional plan's language to be binding on applicants under Criterion 10, the language in the plan must be mandatory, not simply aspirational. In re Rivers Dev., LLC, Nos. 7-1-05, 68-3-07 Vtec, slip op. at 9 (Vt. Envtl. Ct. Jan. 8, 2008) (Durkin, J.). Thus, only language that sets forth a specific policy in clear and unqualified terms will create a mandatory standard enforceable through Criterion 10. In re John A. Russel Corp., 2003 VT 93, ¶ 16, 176 Vt. 420. Conversely, noncompliance with "broad policy statements phrased as 'nonregulatory abstractions'" does not violate Criterion 10. Id. (quoting In re Molgano, 163 Vt. 25, 31—3 (1994)). For example, the Vermont Supreme Court has held that an asphalt plant in a town's rural district did not violate Criterion 10 where the town plan stated that such a district was to "preserve the rural character of the[] area" and prevent harm to "irreplaceable, unique, scares resources and natural areas." Id. at ¶ 18. The Vermont Supreme Court wrote that "[a]lthough the plan evinces a clear intent to protect the rural character of the area" there was no specific policy prohibiting industrial development" and thus the proposed asphalt plant was not prohibited by the applicable town plan. Id. at ¶ 19.

For the reasons set forth above, the applicable City Plan is the 2024 City Plan. To the extent that Neighbors seek to have this Court, in whole or in part, invalidate aspects of the 2024 City Plan or decline to apply aspects of it to the Project, this Court lacks the jurisdiction to do so.

The sole provision Neighbors point to in the 2024 City Plan as applicable to the Project is a clause stating that "[t]he City intends to maintain Wheeler [Nature Park] as a natural area." Ex. HH at 91. The Property is not within the Wheeler Nature Park or a part of the park. Thus, this provision is inapplicable to the Project under Criterion 10. Additionally, this provision is not mandatory, but rather aspirational.

The Project is subject to the 2018 ECOS Plan. The Project is located in the Rural Planning areas. Again, the 2018 ECOS Plan states at Supplement 3 that it is "a strategic plan that it intended to provide **general advisory guidance**." Ex. 8 at 2 (emphasis in original). The

38

express language of the Plan states that it "intentionally chose [to] use[] 'should' rather than 'shall,' in the Plan's goal statements." Id. Despite the fact that the 2018 ECOS Plan, by its terms, is a "general advisory" document, Neighbors assert that its statement that the Rural Development Area "provides for low density commercial, industrial, and residential development (generally 1 dwelling uni.t per acre of less) that is compatible with working lands and natural areas . . . " is mandatory as it relates to the Project. Id. at 4. On its face, the 2018 ECOS Plan is not intended to be a mandatory or regulatory document but instead a "general advisory guidance" document. Id. Further, nothing within the cited language presents mandatory standards that would limit the Project to 1 unit per acre or less because it just states "generally" that would be an appropriate density. Id. Further, to the extent that Neighbors argue that the 2018 ECOS Plan is mandatory with respect to compatibility with working lands or natural areas, there is no mandatory language therein for this Court to apply under Criterion 10.

The Court concludes that the Project complies with Criterion 10 in that the Project does not violate any mandatory provisions of applicable plans.

## V. Unclean Hands

Finally, Neighbors argue that the Project must be denied due to BlackRock having unclean hands or providing materially misleading information in the initial Act 250 application process. While the Court notes that this issue is not explicitly raised in Neighbors' Statement of Questions, to the extent that these issues are implicitly or intrinsically raised, the Court addresses the assertion.

"One who seeks relief in equity must come to the court with clean hands." Savage v. Walker, 2009 VT 8, ¶ 10, 185 Vt. 603 (mem.). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim ...." Percision Instrument Mfg. Co. v. Automotive Maint. Machinery Co., 324 U.S. 806, 814 (1945).

Neighbors point to two issues related to this claim: (1) concerns related to statements on the initial Act 250 application, (2) disclosures or perceived nondisclosures about BlackRock's interest in the Property and Project. We address each in turn.

39

First, Neighbors assert that BlackRock has misrepresented its interest in the Property in its application and on appeal. To the extent that Neighbors' assertion requires the Court to interpret the contract between JAM Golf and BlackRock, this Court cannot do so as it is outside of the scope of this Court's jurisdiction. Blackrock provided a threshold showing that BlackRock has an agreement with JAM Golf that it will undertake permitting activities and will at some point have the option to purchase lots. Blackrock has at all times represented that it has a contract to purchase. JAM Golf signed the application as the landowner. That the terms of a contract between two private parties were not fully disclosed is of no relevance to the Project's compliance with Act 250. This is a de novo appeal and at no time has BlackRock materially misrepresented its interest in the Property.

Second, Neighbors look to two misstatements within its application referencing the land use district the Project is in pursuant to the then-effective 2016 City Plan and 2018 ECOS Plan. In the subsequent Act 250 permit issued, however, the District Commission correctly states the applicable districts under both plans. During this appeal, the references have been correct. Such misstatements and subsequent revision and correction do not give rise some form of disqualification for an Act 250 permit.

Finally, Neighbors argue that the Act 250 application contained three other statements that Neighbors argue are materially misrepresentations. First, BlackRock and JAM Golf responded "no" to a question asking "Does the landowner own or control other lands, other than primary agricultural soils, that are reasonably suited to the purpose of the development or subdivision?" Ex. A. at § 9B(g). Neighbors assert that JAM Golf owns other areas that they assert would be suited for the development or subdivision such that this answer was a misrepresentation. First, primary agricultural soils under Criterion 9 are outside the scope of this appeal. Second, Neighbors do not present any analysis of how other properties would or would not be suited for the development in light of primary agricultural soils.

Next, Neighbors argue that BlackRock and JAM Golf's response to a question within the Act 250 application seeking a description of emission, dust, smoke, odor and noise impacts failed to contain a description of blasting impacts such that the application must

be denied. Ex. A at § 1(b). This assertion borders on disingenuous when the following question within the Act 250 application asks specifically about blasting associated with the application, which BlackRock answers with citations to the Blasting Plan. Id. at § 1(c).

Finally, Neighbors argue that BlackRock should have provided a noise analysis in response to an application prompt stating that one should be provided "[i]f noise is an ongoing factor in the project or construction takes place for an extended period." Id. at § 8(c). Noise is not an ongoing factor in the Project and construction is limited to set hours and days, and blasting noise is limited to a 3-month period. The failure to provide a noise analysis is not a material misrepresentation.

For these reasons, we conclude that the doctrine of unclean hands does not apply to this application and does not present independent grounds to deny the application.

### Conclusion

For the reasons set forth herein, we conclude that the Project complies with Act 250 Criteria 1, 5(A), 8 for aesthetics and for noise, and 10. We further conclude that the application should not be denied on the grounds of unclean hands. As such, we **AFFIRM** the Act 250 Permit including conditions issued below, subject to the Revised Signage Plan dated June 7, 2024 and filed as Exhibit I-1 in this matter, and the conditions thereof.

This concludes the matter before the Court. A Judgment Order accompanies this Decision.

Electronically signed this 2nd day of August 2024, pursuant to V.R.E.F. 9(D)

Thomas G. Walsh, Judge
Vermont Superior Court, Environmental Division